# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP2019 |
| COMPLETE TITLE: | Tetra Tech EC, Inc., and Lower Fox River Remediation LLC, |
| |         Petitioners-Appellants-Petitioners, |
| |    v. |
| | Wisconsin Department of Revenue, |
| |         Respondent-Respondent. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 373 Wis. 2d 287, 890 N.W.2d 598
PDC No:  2017 WI App 4 - Published

| | |
|---|---|
| OPINION FILED: | June 26, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 1, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Brown |
| JUDGE: | Marc A. Hammer |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | A.W. BRADLEY, J., concurs, joined by ABRAHAMSON, J. (opinion filed). |
| | ZIEGLER, J., concurs.  ROGGENSACK, C.J., joins Part I (opinion filed). |
| | GABLEMAN, J., concurs, joined by ROGGENSACK, C.J. (opinion filed). |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the petitioners-appellants-petitioners, there were briefs filed by *Barret V. Van Sicklen*, *Frederic J. Brouner*, *Donald Leo Bach*, and *DeWitt Ross & Stevens S.C.*, Madison.  There was an oral argument by *Barret Van Sicklen*.

For the respondent-respondent, there was a brief filed by *Misha Tseytlin*, solicitor general, with whom on the brief were *Brad D. Schimel*, attorney general, and *Kevin M. LeRoy*, deputy

solicitor general. There was an oral argument by *Misha Tseytlin.*

An amicus curiae brief was filed on behalf of Wisconsin Institute for Law & Liberty, Inc. by *Richard M. Esenberg*, *Thomas C. Kamenick*, and *Wisconsin Institute for Law & Liberty*, Milwaukee.

An amicus curiae brief was filed on behalf of Wisconsin Utilities Association by *James E. Goldschmidt*, *Bradley Jackson*, and *Quarles & Brady LLP*, Madison and Milwaukee.

An amicus curiae brief was filed on behalf of Wisconsin Manufacturers and Commerce, Inc., Midwest Food Products Association, Metropolitan Milwaukee Association of Commerce, Wisconsin Bankers Association, Wisconsin Cheese Makers Association, Wisconsin Paper Council, Dairy Business Association, Inc., Associated Builders and Contractors, Inc. (Wisconsin Chapter), Wisconsin Potato and Vegetable Growers Association, Wisconsin Farm Bureau Federation, and Wisconsin Corn Growers Association by *Robert I. Fassbender* and *Great Lakes Legal Foundation*, Madison.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP2019
(L.C. No. 2015CV132)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Tetra Tech EC, Inc. and Lower Fox River Remediation LLC,**

       **Petitioners-Appellants-Petitioners,**

  **v.**

**Wisconsin Department of Revenue,**

       **Respondent-Respondent.**

**FILED**

**JUN 26, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1    DANIEL KELLY, J.    The Wisconsin Department of Revenue (the "Department") imposed a tax on the petitioners pursuant to Wis. Stat. § 77.52(2)(a)11. (2007-08) for the "processing" of river sediments into waste sludge, reusable sand, and water. The petitioners say the statutory term "processing" is not expansive enough to cover the separation of river sediment into

its component parts, and so they asked us to reject the Department's interpretation of that term.[1]

¶2 Because resolving this question implicates the authoritativeness of an administrative agency's interpretation and application of a statute, we asked the parties to also address this issue: "Does the practice of deferring to agency interpretations of statutes comport with Article VII, Section 2 of the Wisconsin Constitution, which vests the judicial power in the unified court system?"[2]

¶3 We conclude that the term "processing" in Wis. Stat. § 77.52(2)(a)11. includes the separation of river sediment into its component parts. Therefore, we affirm the court of appeals. We have also decided to end our practice of deferring to

---

[1] This is a review of a published decision of the court of appeals, Tetra Tech EC, Inc. v. DOR, 2017 WI App 4, 373 Wis. 2d 287, 890 N.W.2d 598, which affirmed an order of the Brown County Circuit Court, the Honorable Marc A. Hammer presiding, that affirmed an order of the Wisconsin Tax Appeals Commission ("Commission").

[2] All references to the Wisconsin Statutes with respect to the question of whether we defer to an administrative agency's interpretation of a statute are to the 2015-16 version unless otherwise indicated.

All references to the Wisconsin Statutes with respect to the meaning of "processing," as that term is used in Wis. Stat. § 77.52(2)(a)11., are to the 2007-08 version unless otherwise indicated. We cite this version, as the court of appeals did, because the relevant tax years for the case are 2007-09 and because the 2005-06 version of the Wisconsin Statutes, which would govern the 2007 tax year, is not materially different from the 2007-08 version. See Tetra Tech EC, Inc., 373 Wis. 2d 287, ¶1 n.1.

administrative agencies' conclusions of law.[3]  However, pursuant to Wis. Stat. § 227.57(10), we will give "due weight" to the experience, technical competence, and specialized knowledge of an administrative agency as we consider its arguments.[4]

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶4  On November 13, 2007, the United States Environmental Protection Agency ("EPA") ordered several paper companies to remediate the environmental impact of polychlorinated biphenyls ("PCBs") they had released into the Fox River as part of their manufacturing activities.  The paper companies created Lower Fox River Remediation, LLC ("LFR Remediation") to carry out the EPA's order.  LFR Remediation hired Tetra Tech EC, Inc. ("Tetra Tech") to perform the actual remediation activities.  Tetra Tech subcontracted a portion of the work to Stuyvesant Dredging, Inc. ("Stuyvesant Dredging").[5]  Stuyvesant Dredging's responsibilities

---

[3] Although a majority of the court agrees we should no longer defer to administrative agencies' conclusions of law, there is disagreement with respect to why we should end the practice.  This opinion describes one rationale; other opinions will contain alternative bases for our conclusion.

[4] Justice Rebecca Bradley joins the opinion in toto.  Chief Justice Roggensack joins Sections I., II.A.1., II.A.2., II.B., and III.  Justice Gableman joins Paragraphs 1-3, Sections I., II. (introduction), II.A. (introduction), II.A.1., II.A.2., II.A.6., II.B., and III., and the mandate, although he does not join Section II.A.6. to the extent that the first sentence of Paragraph 84 implies a holding on constitutional grounds.  Therefore, this opinion announces the opinion of the court with respect to Sections I., II.A.1., II.A.2., II.B., and III.

[5] Stuyvesant Dredging is now known as Stuyvesant Projects Realization, Inc.

3

included receiving sediment dredged from the Fox River, and then using membrane filter presses to separate it into its component parts: water, sand, and PCB-containing sludge. Part of the purpose of Stuyvesant Dredging's work was to "provide a supply of relatively clean sand that could be sold for off-site use or used beneficially on site."

¶5 In 2010, the Department conducted a field audit of both Tetra Tech and LFR Remediation (collectively, "Taxpayers"). During that same year, the Department issued a Notice of Field Audit Action that assessed a use tax on LFR Remediation's purchase of the portion of Tetra Tech's remediation services that represented Stuyvesant Dredging's work. The Department also issued a Notice of Field Audit Action that assessed a sales tax on the portion of Tetra Tech's sale of remediation services to LFR Remediation (to the extent it reflected Stuyvesant Dredging's work). In both notices, the Department said Stuyvesant Dredging's activities constituted the "repair, service, alteration, fitting, cleaning, painting, coating, towing, inspection and maintenance of tangible personal property," and so were taxable under Wis. Stat. § 77.52(2)(a)10.

¶6 Tetra Tech and LFR Remediation petitioned the Department for redetermination of the assessed taxes. The Department denied the petitions, concluding that Stuyvesant Dredging's "dewatering and desanding of dredged, contaminated sediment that is not returned to the river is a service to tangible personal property" that was taxable under Wis. Stat. § 77.52(2)(a)10. Tetra Tech and LFR Remediation then filed

4

petitions with the Wisconsin Tax Appeals Commission (the "Commission") requesting review of the Department's denial of their reassessment requests. In its presentation to the Commission, the Department argued that Stuyvesant Dredging's activities were taxable under § 77.52(2)(a)10., or alternatively, under § 77.52(2)(a)11. as "processing" of tangible personal property. The Commission issued a Ruling and Order in favor of the Department.[6] Upholding the sales and use taxes, the Commission concluded that "what SDI [Stuyvesant Dredging] does with the sediment is 'processing . . . for a consideration for consumers [Tetra Tech] who furnish directly or indirectly the materials [sediment] used in the . . . processing' under the meaning of Wis. Stat. § 77.52(2)(a)11." The Commission reasoned that "[t]he dictionary definition of 'processing' is 'to put through the steps of a prescribed procedure; or, to prepare, treat, or convert by subjecting to a special process.' SDI's activities certainly fall within that definition."[7]

¶7 Tetra Tech and LFR Remediation timely filed a petition for judicial review, pursuant to Wis. Stat. § 227.52, in the

---

[6] Tetra Tech and LFR Remediation's petitions received separate docket numbers (12-S-192 and 12-S-193, respectively), but the Commission decided the cases together.

[7] See Processing, The American Heritage Dictionary 1444 (3d ed. 1992) (defining "processing" in relevant part: "1. To put through the steps of a prescribed procedure," and as "2. To prepare, treat, or convert by subjecting to a special process").

Brown County Circuit Court. The petition requested the circuit court to set aside the Commission's Ruling and Order that Stuyvesant Dredging's work subjected Tetra Tech and LFR Remediation to sales and use taxes. The circuit court affirmed, relying on the same definition of "processing" the Commission had used. LFR Remediation and Tetra Tech appealed. The court of appeals, using a dictionary definition of "processing" similar to the one used by the circuit court and the Commission, affirmed. Tetra Tech EC, Inc. v. DOR, 2017 WI App 4, ¶¶2, 17, 373 Wis. 2d 287, 890 N.W.2d 598. We granted Tetra Tech and LFR Remediation's petition for review, and now affirm.

## II. DISCUSSION

¶8 The ultimate question we must answer in this case is whether the petitioners are subject to the tax levied on them by the Department of Revenue pursuant to Wis. Stat. § 77.52(2)(a)11. The Commission says they are, and urges us to agree with its interpretation and application of that statute.

¶9 Before we may answer that question, however, there is a predicate matter we must address: When we review an administrative agency's decision, are there circumstances in which we must defer to the agency's interpretation and application of the law? Our current jurisprudence says there are. And ever since Harnischfeger Corp. v. LIRC, 196 Wis. 2d 650, 659, 539 N.W.2d 98 (1995), we have treated that deference as a "standard of review." Therefore, because identifying the appropriate standard of review is an appellate court's first task, we will begin there. Once we resolve that

issue, we will address the interpretation of Wis. Stat. § 77.52(2)(a)11. and how it applies to Tetra Tech and LFR Remediation.

A.  Deference to Administrative Agencies

¶10  Our assessment of the deference doctrine begins in the following section with a brief overview of its current contours. To truly understand its function, however, we need to search out its roots, the results of which we discuss in the second section.  As preparation for our comparison of the deference doctrine to our constitutional responsibilities, we examine in the third section the nature of the judiciary's powers and how they relate to the other governmental branches.  In the fourth and fifth sections, we separately assess "great weight" and "due weight" deference in light of the constitutional provisions and principles that govern our work.

1.  Current Standard for Reviewing Administrative Agency Decisions

¶11  We generally review administrative agency decisions in accordance with chapter 227 of our statutes.[8]  As relevant here, Wis. Stat. § 227.57 contains two specific directions regarding how we are to conduct those reviews.  First, it instructs a court to "set aside or modify the agency action if it finds that

---

[8] This decision applies to judicial review of all administrative agency decisions.  While chapter 227 applies to judicial review of most administrative decisions, it does not apply to all.  See, e.g., Wis. Stat. § 102.23 (establishing procedures for judicial review of workers compensation orders).

the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law." § 227.57(5). And second, it instructs that, "[s]ubject to sub. (11), upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it."[9] § 227.57(10).

¶12 We have developed, over time, a contextualized methodology of reviewing administrative agency decisions.[10] The provenance of this methodology lies partly with the preceding statute, and partly with our own doctrinal developments. In its modern iteration, this method begins with the principle that "statutory interpretation is a question of law which courts decide de novo." See Harnischfeger, 196 Wis. 2d at 659. And we recognize that "a court is not bound by an agency's interpretation of a statute." Id. But then we wrap those principles within another, one we have said is of equal gravity:

---

[9] Subsection 11 does not apply to the case before us today, but it will play a small part in our discussion below. This subsection provides that "[u]pon review of an agency action or decision affecting a property owner's use of the property owner's property, the court shall accord no deference to the agency's interpretation of law if the agency action or decision restricts the property owner's free use of the property owner's property." Wis. Stat. § 227.57(11).

[10] Whether, or how closely, our practice comports with the preceding statutory instructions will be addressed below.

"As important, however, is the principle that courts should defer to an administrative agency's interpretation of a statute in certain situations." Id.

¶13 Calibrating this "deference principle" to those "certain situations" resulted in our contextualized, three-tiered treatment of an administrative agency's conclusions regarding the interpretation and application of statutory provisions. When reviewing those conclusions, we give them (1) great weight deference; (2) due weight deference; or (3) no deference at all. See id. at 659-60 & n.4.

¶14 We have said the first of these——great weight deference——is appropriate upon concluding that:

> (1) the agency was charged by the legislature with the duty of administering the statute; (2) . . . the interpretation of the agency is one of long-standing; (3) . . . the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) . . . the agency's interpretation will provide uniformity and consistency in the application of the statute.

Id. at 660. Giving "great weight" to an administrative agency's interpretation means the court must adopt it so long as it is reasonable. Id. at 661 ("[W]e have repeatedly held that an agency's interpretation must then merely be reasonable for it to be sustained."). An interpretation is reasonable if it does not "directly contravene[] the words of the statute," is not "clearly contrary to legislative intent," and is not "without

9

rational basis." See id. at 662.[11] Deference is required even when the court has a more reasonable interpretation of the law. Racine Harley-Davidson, Inc. v. Wis. Div. of Hearings & Appeals, 2006 WI 86, ¶17, 292 Wis. 2d 549, 717 N.W.2d 184 (stating that under great weight deference, a reviewing court must accept "an agency's reasonable statutory interpretation, even if the court concludes that another interpretation is equally reasonable, or even more reasonable, than that of the agency"); Crystal Lake Cheese Factory v. LIRC, 2003 WI 106, ¶24, 264 Wis. 2d 200, 664 N.W.2d 651 ("This [the need to defer] is true even if the court were to conclude that another interpretation was more reasonable."). These principles also apply to the agency's application of the statute to undisputed facts, which is itself a question of law.[12] See, e.g., Crystal Lake Cheese Factory, 264 Wis. 2d 200, ¶30 ("LIRC's interpretations, including its determination of reasonable accommodation in this case, should be given 'great weight' deference.").

¶15 The second tier of review, "due weight" deference, is appropriate when "the statute is one that the agency was charged

---

[11] In the context of an ambiguous statute, "an agency's interpretation cannot, by definition, be found to directly contravene it." Harnischfeger Corp. v. LIRC, 196 Wis. 2d 650, 662, 539 N.W.2d 98 (1995).

[12] See DOR v. Exxon Corp., 90 Wis. 2d 700, 713, 281 N.W.2d 94 (1979) ("The question of whether the facts fulfill a particular legal standard is itself a question of law.").

with administering,"[13] and "the agency has some experience in an area, but has not developed the expertise which necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court."[14] Under this standard, "the fact that the agency's interpretation is reasonable does not mean that its interpretation will necessarily be upheld." UFE Inc. v. LIRC, 201 Wis. 2d 274, 287, 548 N.W.2d 57 (1996). Instead, "[i]f a court finds an alternative interpretation more reasonable, it need not adopt the agency's interpretation." Id. In effect, this creates a "tie goes to the agency" rule in which deference is required unless the court's interpretation is more reasonable than that of the agency. ABKA Ltd. P'ship v. DNR, 2002 WI 106, ¶116, 255 Wis. 2d 486, 648 N.W.2d 854 (Sykes, J., dissenting) ("[T]he agency's legal interpretation will be upheld even if there is a different, equally reasonable interpretation——in other words, a tie goes to the agency."); see also Daniel R. Suhr, Interpreting Wisconsin Administrative Law at 7 (August 23, 2017), https://ssrn.com/abstract=3025085 ("Due weight might be called 'tie goes to the agency' deference."). The agency's application of a statute to undisputed facts is also entitled to due weight

---

[13] Operton v. LIRC, 2017 WI 46, ¶20, 375 Wis. 2d 1, 894 N.W.2d 426 (quoting Racine Harley-Davidson, Inc. v. Wis. Div. of Hearings & Appeals, 2006 WI 86, ¶107, 292 Wis. 2d 549, 717 N.W.2d 184 (Roggensack, J., concurring)).

[14] UFE Inc. v. LIRC, 201 Wis. 2d 274, 286, 548 N.W.2d 57 (1996).

deference when it satisfies the Harnischfeger preconditions. See DOR v. A. O. Smith Harvestore Prods., Inc., 72 Wis. 2d 60, 65-66, 240 N.W.2d 357 (1976) ("Due deference must be accorded the agency's application of the law to the found facts when the agency has particular competence or expertise in the matter at hand." (citing Wis. Stat. § 227.20(2) (1973))).

¶16 When conditions support neither great weight nor due weight deference, we give the administrative agency's statutory interpretation no deference at all. See Racine Harley-Davidson, Inc., 292 Wis. 2d 549, ¶19. In those circumstances, "the reviewing court merely benefits from the agency's determination and may reverse the agency's interpretation even when an alternative statutory interpretation is equally reasonable to the interpretation of the agency." Id., ¶20. This is the same method we use in reviewing questions of law decided by our circuit courts and court of appeals. State v. Alger, 2015 WI 3, ¶21, 360 Wis. 2d 193, 858 N.W.2d 346 ("The interpretation and application of a statute present questions of law that this court reviews de novo while benefitting from the analyses of the court of appeals and circuit court.").

### 2. History of the Deference Doctrine

¶17 Although we often speak of the deference doctrine in a manner that suggests it started and developed as a cohesive whole, it did not. It is actually a portmanteau, derived from two different sources, the pieces of which developed over two different timelines, until they reached their fullest expression

in Harnischfeger. For purposes of clarity and ease of access, we will rehearse their histories separately.

i. A Brief History of "Great Weight" Deference

¶18 The road to Harnischfeger's "great weight deference" is a long one (it reaches as far back as Harrington v. Smith, 28 Wis. 43, 59-70 (1871)), but it is not an entirely clear one. As originally conceived, the doctrine did not contemplate deference at all, and it certainly did not purport to command the court's obedience. But with time it developed into a decision-avoidance doctrine that left to the administrative agencies the job of statutory interpretation and application when the doctrine's preconditions were satisfied. A dozen years ago, now-Chief Justice Patience Drake Roggensack did yeoman's work in tracing the development and effect of this doctrine. See The Honorable Patience Drake Roggensack, Elected to Decide: Is the Decision-Avoidance Doctrine of Great Weight Deference Appropriate in This Court of Last Resort?, 89 Marq. L. Rev. 541, 548-60 (2006). The following history relies heavily on that scholarship.

¶19 In Harrington, we discussed some of the canons of construction we used in discerning the proper meaning of an ambiguous statute. One of those canons says that an agency's understanding of the statute could be probative of its meaning: "Long and uninterrupted practice under a statute, especially by the officers whose duty it was to execute it, is good evidence of its construction, and such practical construction will be

adhered to, even though, were it <u>res integra</u>,[15] it might be difficult to maintain it." <u>Harrington</u>, 28 Wis. at 68. The practice of executive branch employees "extending through a period of so many years, ought, it would seem, to be some evidence of what the law is; and some persons might be disposed, perhaps, to think, evidence equal to a decision of this court." <u>Id.</u> at 69. "Great weight," we concluded, "is undoubtedly to be attached to a construction which has thus been given." <u>Id.</u>

¶20 This is not the language of deference, but of persuasion. In a search for the proper meaning of an ambiguous statute, we said we could properly have recourse to the views of others and treat them as pieces of evidence for use in the process of statutory construction in which we ourselves were engaged. In support of our statement about the evidentiary nature of the executive employees' views, we cited <u>Edwards'</u> <u>Lessee v. Darby</u>, 25 U.S. (12 Wheat.) 206, 210 (1827). There, the United States Supreme Court said that "[i]n the construction of a doubtful and ambiguous law, the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is

---

[15] "<u>Res integra</u>" means, literally, "an entire thing." <u>Res Integra</u>, <u>Black's Law Dictionary</u> (10th ed. 2014) (citing <u>Res Nova</u>, <u>id.</u>). Typically, the phrase refers to a matter of first impression. <u>See</u> <u>Res Integra</u>, <u>Black's Law Dictionary</u> (10th ed. 2014); <u>see also</u> <u>Res Nova</u>, <u>id.</u> (stating that <u>res nova</u> is also termed <u>res integra</u>, and defining <u>res nova</u> as a "case of first impression").

14

entitled to very great respect." Id. One may respect an interpretation, even greatly, without deferring to it.

¶21 Nor was Harrington expressing deference to an administrative agency when it said we would adhere to the executive branch's long-standing interpretation of a statute. Instead, we were acknowledging that a change in an ancient practice could have unacceptably disruptive consequences. For this principle we cited Rogers v. Goodwin, in which the Supreme Judicial Court of Massachusetts said:

> Were the Court now to decide that this construction is not to be supported, very great mischief would follow. And although, if it were now res integra,[16] it might be very difficult to maintain such a construction, yet at this day the argumentum ab inconvenienti[17] applies with great weight. We cannot shake a principle which in practice has so long and so extensively prevailed. If the practice originated in error, yet the error is now so common that it must have the force of law.

2 Mass. (2 Tyng) 475, 477-78 (Mass. 1807).

¶22 Harrington cast a long shadow. The court was content for many years to repeat and apply its formulation without reading deference into its language. See, e.g., State ex rel. Owen v. Donald, 160 Wis. 21, 111, 151 N.W. 331 (1915) (quoting Harrington, and stating long practice is evidence of meaning); State ex rel. State Ass'n of Y.M.C.A. of Wis. v. Richardson, 197

---

[16] See supra n.15.

[17] "Argumentum ab inconvenienti" means "[a]n argument from inconvenience; an argument that emphasizes the harmful consequences of failing to follow the position advocated." Argumentum, Black's Law Dictionary (10th ed. 2014).

15

Wis. 390, 393, 222 N.W. 222 (1928) ("If we were in doubt as to the proper construction to be placed upon the statute, we should have to give much weight to the practical construction which has been placed upon the statute ever since its enactment."); Wis. Axle Div. (Timken-Detroit Axle Co.) v. Indus. Comm'n, 263 Wis. 529, 537b, 60 N.W.2d 383 (1953) (per curiam) ("This court has held that where there is any obscurity in the meaning of a statute, practical construction given by the administrative agency charged with administering such law is entitled to great weight."); Trczyniewski v. City of Milwaukee, 15 Wis. 2d 236, 240, 112 N.W.2d 725 (1961) (same). As Justice Rebecca Bradley recently observed, "[b]y recognizing the value of executive interpretations without entirely ceding interpretive authority to the executive, these older cases reflect a more nuanced appreciation for judicial interaction with agency interpretation . . . ." Operton v. LIRC, 2017 WI 46, ¶78, 375 Wis. 2d 1, 894 N.W.2d 426 (R. Grassl Bradley, J., concurring).

¶23 But then came Pabst v. Wisconsin Department of Taxation, 19 Wis. 2d 313, 120 N.W.2d 77 (1963). There, we started our analysis of an agency's statutory interpretation with the proposition that "[e]rrors of law are always reviewable by the reviewing court." Id. at 322. But in our extended discussion of the nature of that review, we did something new. We imported the concept of deference. Federal courts, we noted, afforded deference to an administrative agency's application of a statute to undisputed facts under certain circumstances. See id. at 322-24. In determining "whether the administrative

16

agency has correctly applied a statute to certain facts," the federal courts would employ either the "analytical approach" or the "practical approach." See id. at 322.

¶24 Under the analytical approach, "the court decides which part of the agency's determination presents a question of fact and which part a question of law." Id. As Professor Kenneth Culp Davis described this methodology, the court upholds the agency's factual findings if they have a reasonable basis. 4 Kenneth Culp Davis, Administrative Law Treatise § 30.01 (1958). But with respect to questions of law, the court substitutes its judgment for that of the agency. Id. Essentially, this creates a de novo standard for reviewing questions of law.

¶25 The practical approach treats the agency's decision more like legislation than adjudication. It avoids any attempt to distinguish between facts and law, and instead holds that "[t]he judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Pabst, 19 Wis. 2d at 323 (quoting Rochester Tel. Corp. v. United States, 307 U.S. 125, 146 (1939)).[18]

---

[18] The practical approach is very similar to the "rational basis" standard of review we apply to legislation. See Blake v. Jossart, 2016 WI 57, ¶31, 370 Wis. 2d 1, 884 N.W.2d 484 (indicating that under rational basis review, "[i]n cases where a statutory classification does not involve a suspect class or a fundamental interest, the classification will be upheld if there is any rational basis to support it" (quoting State v. Burgess, 2003 WI 71, ¶10, 262 Wis. 2d 354, 665 N.W.2d 124)).

17

¶26 Pabst observed that the method of review chosen by the court would be outcome-determinative with respect to whose application of the statute would control the case: "[Professor Davis] concludes that the court applies the analytical approach when it does not wish to be bound by the agency's application of a statute to a set of facts, and the practical approach when it believes the agency's application of the law should be deferred to." Pabst, 19 Wis. 2d at 323. The primary factor driving the selection of the review method, Professor Davis believed, was the agency's expertise:

> Davis believes that one of the most-important factors which influences the court's choice of approach in this field is the comparative qualification of court and agency to decide the particular issue. The court often deems agencies and their staffs to be expert within their own specialized fields. In such situations, the practical approach is likely to be employed rather than the analytical in determining the scope of review to be applied.

Id. (citing Davis, supra ¶24, at § 30.01 et seq. (Professor Kenneth Culp Davis, University of Chicago School of Law and University of San Diego School of Law)). The "practical approach" bears a close resemblance to the "great weight deference" formulation. It also reaches the same result, to wit, preference for the agency's conclusion of law over that of the court.

¶27 We concluded in Pabst that the statutes as they existed at the time bound us to use the analytical approach.

18

"We believe that pars. (b) and (d) of sec. 227.20(1), Stats.,[19] require Wisconsin courts to employ the analytical approach when reviewing agency decisions." Pabst, 19 Wis. 2d at 323. But we also said that dividing the facts from the law would not necessarily prevent us from deferring to the agency's application of the statute (i.e., the practical approach):

> Nevertheless, in fields in which an agency has particular competence or expertise, the courts should not substitute their judgment for the agency's application of a particular statute to the found facts if a rational basis exists in law for the agency's interpretation and it does not conflict with the statute's legislative history, prior decisions of this court, or constitutional prohibitions.

Id. at 323-24.

---

[19] At the time, Wis. Stat. § 227.20(1) (1961) provided, in part:

> The court may affirm the decision of the agency, or may reverse or modify it if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions or decisions being:
>
> . . . .
>
> (b) In excess of the statutory authority or jurisdiction of the agency, or affected by other error of law; or
>
> . . . .
>
> (d) Unsupported by substantial evidence in view of the entire record as submitted; . . . .

§ 227.20(1)(b), (d) (1961).

¶28 We used the analytical approach in Pabst, in accordance with statutory requirements,[20] but only because we did not "deem the board more competent than this court to decide a question of law involving trust administration." See id. at 324. Subsequent cases confirm that our commitment to the analytical approach has always been more nominal than real. For example, in DOR v. Exxon Corp., we said:

> While this court has held that ch. 227, Stats. requires that courts employ the "analytical" approach when reviewing agency decisions, this court will give deference to agency determinations, where the agency has particular expertise, rational basis exists in law for the agency's interpretation, and it does not conflict with the statute's legislative history, prior decisions of this court, or constitutional prohibitions.

90 Wis. 2d 700, 713, 281 N.W.2d 94 (1979) (citing Pabst, 19 Wis. 2d at 323-24), aff'd, 447 U.S. 207 (1980). So although the statutes require a de novo review of questions of law (the analytical approach), we have deferred to an administrative agency (the practical approach) when circumstances satisfied our criteria.

¶29 Where we once treated an agency's interpretation of a statute as evidence of its meaning (Harrington), Pabst put us in a posture of deference to administrative agencies. The shift was not a comfortable one, as evidenced by a sporadic, but short-lived, return to a more Harrington-like understanding of "great weight." See Mednis v. Indus. Comm'n, 27 Wis. 2d 439,

---

[20] Wis. Stat. § 227.20(1)(b), (d) (1961).

444, 134 N.W.2d 416 (1965) ("The construction and interpretation adopted by the administrative agency charged with the duty of applying the law is entitled to great weight in the courts."); see also Cook v. Indus. Comm'n, 31 Wis. 2d 232, 240, 142 N.W.2d 827 (1966) (same).  Each of these cases relied on pre-Pabst authorities, such as Wisconsin Axle Division and Trczyniewski,[21] in which the agencies' understanding of the law assisted, but did not supplant, our own application of the statutes.

¶30 When we eventually circled back to Pabst's understanding of "great weight," we granted administrative agencies even broader deference than they had enjoyed before. See Roggensack, supra ¶18, at 558-59.  Whereas Pabst called for deference only to an agency's application of a statute to undisputed facts, we extended that deference to the construction of the statute itself in Bucyrus-Erie Co. v. DILHR, 90 Wis. 2d 408, 417, 280 N.W.2d 142 (1979).  There, we acknowledged that "questions of law are always reviewable by the court," and that "[t]he construction of a statute or the application of a statute to a particular set of facts is such a question of law." Id.  But when we applied the Pabst deference principle, we made no distinction between interpreting a statute and applying it.

---

[21] Trczyniewski v. City of Milwaukee, 15 Wis. 2d 236, 240, 112 N.W.2d 725 (1961); Wis. Axle Div. (Timken-Detroit Axle Co.) v. Indus. Comm'n, 263 Wis. 529, 537b, 60 N.W.2d 383 (1953) (per curiam).

We acknowledged the case "involve[d] the interpretation and application of certain statutory provisions," but then said:

> The court will hesitate to substitute its judgment for that of the agency on a question of law if " . . . a rational basis exists in law for the agency's interpretation and it does not conflict with the statute's legislative history, prior decisions of this court, or constitutional prohibitions."

Bucyrus-Erie Co., 90 Wis. 2d at 411, 417 (quoting Pabst, 19 Wis. 2d at 323-24). After Bucyrus-Erie Co., we never returned to Harrington's formulation that an administrative agency's application of a statute was evidence of its meaning that the court could accept or reject in the process of authoritatively resolving questions of law. By expanding the reach of the deference principle, "the court continued a trend of applying great weight deference more and more often, thereby construing statutes less and less frequently." Roggensack, supra ¶18, at 556.

¶31 Only one transformation remains before we reach the current expression of the deference doctrine. Prior to Harnischfeger, we treated deference to administrative agencies as a choice, something the courts could do in the process of interpreting and applying a statute, but were not required to do. Just a few years before we decided Harnischfeger, we said: "The interpretation of a statute presents a question of law, and the 'blackletter' rule is that a court is not bound by an agency's interpretation. Courts, however, frequently refrain from substituting their interpretation of a statute for that of the agency charged with the administration of a law." Lisney v.

22

LIRC, 171 Wis. 2d 499, 505, 493 N.W.2d 14 (1992). "Frequently refrain" describes something episodic, not a rule of uniform application. It implies the court will decide, on a case-by-case basis, whether to defer to the administrative agency as it resolves questions of law.

¶32 Harnischfeger, however, made the deference doctrine a systematic requirement upon satisfaction of its preconditions. See Roggensack, supra ¶18, at 553. It accomplished this feat by promoting deference from a canon of construction to a standard of review: "Whether or not a court agrees or disagrees with LIRC's methodology, however, is not the issue in this case. Instead, the central question is what standard of review the courts of this state should apply when called upon to evaluate an agency's interpretation of a statute." Harnischfeger, 196 Wis. 2d at 659.[22] We then identified "great weight" deference, "due weight" deference, and no deference as the available options. Id. at 659-60. Determining the correct standard of review, of course, is something an appellate court does at the

---

[22] "In setting the frame for broad deference to agencies, the court [in Harnischfeger] described the legal issue before the court as deciding what level of deference it should accord LIRC's decision. It did not characterize the legal issue as the interpretation of an ambiguous statute." The Honorable Patience Drake Roggensack, Elected to Decide: Is the Decision-Avoidance Doctrine of Great Weight Deference Appropriate in This Court of Last Resort?, 89 Marq. L. Rev. 541, 553 (2006).

23

very beginning of its work, and it definitively controls how we address questions of both fact and law.[23]

¶33 Enshrining this doctrine as a standard of review bakes deference into the structure of our analysis as a controlling principle. By the time we reach the questions of law we are supposed to review, that structure leaves us with no choice but to defer if the preconditions are met. Id. at 663 ("When, as in this case, great weight deference is appropriate and the agency's interpretation is not otherwise unreasonable, 'the court of appeals and this court should refrain from substituting their interpretation of [a] statute for the long-standing interpretation of the agency charged with its administration.'" (quoted source omitted) (emphasis omitted)). Harnischfeger made good on this premise by reversing the court of appeals for failing to defer to the administrative agency. Our subsequent cases make it clear we understand the mandatory nature of the deference doctrine. See, e.g., Crystal Lake Cheese Factory, 264 Wis. 2d 200, ¶52 ("As we have determined LIRC's interpretation to be reasonable, under the 'great weight' standard of review,

---

[23] Utah v. Thurman, 846 P.2d 1256, 1265-66 (Utah 1993) ("It is widely agreed that the primary function of a standard of review is to apportion power and, consequently, responsibility between trial and appellate courts for determining an issue or a class of issues. . . . In determining the appropriateness of a particular allocation of responsibility for deciding an issue or a class of issues, account should be taken of the relative capabilities of each level of the court system to take evidence and make findings of fact in the face of conflicting evidence, on the one hand, and to set binding jurisdiction-wide policy, on the other." (internal citations omitted)).

we _must_, therefore, defer to LIRC's conclusion." (emphasis added)).

ii. A Brief History of "Due Weight" Deference

¶34 "Due weight deference" is of a much younger vintage than "great weight deference." It also has a different source. Whereas the latter developed as a home-grown doctrine within the judiciary, the former has its roots in our statutes. In 1943, our legislature adopted Wis. Stat. § 227.20(2) (subsequently renumbered to § 227.57(10)), which read: "Upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it."[24]

¶35 Our first opportunity to engage with that language came in Ray-O-Vac Co. v. Wisconsin Employment Relations Board, 249 Wis. 112, 119, 23 N.W.2d 489 (1946). There, the Wisconsin Employment Relations Board asserted:

> [O]n a review of the board's findings, the court has no jurisdiction to determine the factual issues anew if there is some evidence before the board reasonably tending to support a finding, and "the court may not weigh the evidence to ascertain whether it preponderates in favor of the finding" . . . ; or substitute its judgment for that of the board even though the court might have decided the question differently had it been before the court de novo.

Id. (internal citation omitted).

---

[24] Wis. Stat. § 227.20(2) (1943); see § 1, ch. 375, Laws of 1943 (creating § 227.20(2)); see also § 24, ch. 414, Laws of 1975 (renumbering); 1985 Wis. Act 182, § 41 (renumbering again).

25

¶36 We agreed with the Board, noting that "[i]n relation to a court review of the board's findings and orders it must be noted that there is applicable thereto" the terms of Wis. Stat. § 227.20(2) (1943).  Ray-O-Vac Co., 249 Wis. at 119-20.  The court's reference to the Board's orders (in addition to its findings) suggests the court gave "due weight . . . [to] the experience, technical competence, and specialized knowledge of the agency involved," see § 227.20(2) (1943), as it reviewed the Board's conclusions of law as well.  This is probable because the court relied on a separate source of authority for the proposition that it must defer to the Board's findings of fact.  It cited Wisconsin Labor Relations Board v. Fred Rueping Leather Co., which held:

> [I]f th[e] evidence supports the finding of the industrial commission, the finding must stand.  The Wisconsin Labor Relations Act in sec. 111.10 (5), Wis. Stats., provides what is lacking in the Workmen's Compensation Act, namely, an implied authorization to the courts to review the facts, coupled with the express provision that the findings, "if supported by evidence in the record," shall be conclusive.

228 Wis. 473, 494, 279 N.W. 673 (1938).[25]

---

[25] We were, perhaps, even more enigmatic with respect to the doctrine's application to questions of law in Milwaukee Electric Railway & Transport Co. v. Public Service Commission, 261 Wis. 299, 302-03, 52 N.W.2d 876 (1952).  There, we said "[t]he court must also recognize that the commission has expert knowledge, that such knowledge may be applied by it, and that even though we might differ with the commission, we are without power to substitute our views of what may be reasonable."  Id. In the next sentence, however, we said only that "[w]e may not disturb the commission's findings," which is a reference only to the facts that the agency found.  See id. at 303.

26

¶37 We were not any more specific about how "due weight" consideration affects conclusions of law when we decided Muskego-Norway Consolidated Schools Joint School District No. 9 v. Wisconsin Employment Relations Board, 35 Wis. 2d 540, 151 N.W.2d 617 (1967). But we did frame the statute's provision in terms of "deference":

> [I]n this court's judicial review we are not required to agree in every detail with the WERB as to its findings, conclusions and order. . . . Sec[tion] 227.20 (2), Stats., requires that upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved. In short, this means the court must make some deference to the expertise of the agency.

Muskego-Norway Consol. Sch. Joint Sch. Dist. No. 9, 35 Wis. 2d at 562. We applied the statute's "due weight" mandate to the Board's findings and conclusions of law without differentiation. "Some deference" was due, we said, but we did not say how that should be applied or quantified.

¶38 We were a little more direct on this topic in Vivian v. Examining Board of Architects, Professional Engineers, Designers and Land Surveyors, in which we reviewed the Board's determination of whether the defendant's conduct could satisfy a "gross negligence" standard. 61 Wis. 2d 627, 638, 213 N.W.2d 359 (1974). We strongly implied that the Board was qualified not just to apply that standard, but to define it as well:

> The legislative command that due weight is to be given to "the experience, technical competence, and specialized knowledge of the agency involved," in determining what is gross negligence, indicates the

27

> determination of the grossness of the negligence is to be made by those knowledgeable as to the particular profession involved.

Id. (emphasis added) (quoting Wis. Stat. § 227.20(2) (1971)).

¶39 A few years later, we stated explicitly that Wis. Stat. § 227.20(2) (1973) applies to an administrative agency's legal conclusions. And we described deference as a requirement when its preconditions were met. In A. O. Smith Harvestore Products, Inc., we acknowledged that "[t]his court has uniformly held that whether or not the facts found fulfill a particular legal standard is a question of law, not a question of fact." 72 Wis. 2d at 65. And then we said that under § 227.20(2) (1973), "[d]ue deference must be accorded the agency's application of the law to the found facts when the agency has particular competence or expertise in the matter at hand." A. O. Smith Harvestore Prods., Inc., 72 Wis. 2d at 65-66 (emphasis added) (citing § 227.20(2) (1973)).

¶40 As we mentioned above, Harnischfeger elevated the deference doctrine from a canon of construction to a standard of review. "Whether or not a court agrees or disagrees with LIRC's methodology, however, is not the issue in this case. Instead, the central question is what standard of review the courts of this state should apply when called upon to evaluate an agency's interpretation of a statute." Harnischfeger, 196 Wis. 2d at 659. So, just like "great weight" deference, "due weight" deference has become an integral, and therefore unavoidable, part of the framework within which we review an administrative agency's conclusions of law.

28

¶41 Fortified by this history of our deference jurisprudence, we can now determine whether the doctrine is consistent with the judiciary's constitutional responsibility.[26]

### 3. The Judiciary's Constitutional Responsibilities

¶42 As the deference doctrine developed, we recognized that its operation allowed the executive branch of government to authoritatively decide questions of law in specific cases brought to our courts for resolution. But nowhere in the journey from Harrington to Harnischfeger did we determine whether this was consistent with the allocation of governmental power amongst the three branches. So, as a matter of first impression, we consider whether our deference doctrine is compatible with our constitution's grant of power to the judiciary:

> The judicial power of this state shall be vested in a unified court system consisting of one supreme court, a court of appeals, a circuit court, such trial courts of general uniform statewide jurisdiction as the legislature may create by law, and a municipal court if authorized by the legislature under section 14.

Wis. Const. art. VII, § 2. It is, perhaps, tautological to say that the judicial power should reside in the judiciary. But the

---

[26] Roggensack, supra n.22, at 542 ("[B]ecause the Wisconsin Supreme Court's members were elected to decide what the law is, and because the court restricts its own docket in order to maintain its law-declaring status, it [is] appropriate for the court to re-examine whether decision-avoidance is too often replacing the court's full consideration of the issues raised on appeal, at least in regard to state agency decisions to which the highest level of deference, great weight deference, is accorded.").

constitution does not define what that term comprises, nor does it explicitly describe how that power relates to the other branches of government.[27]

¶43 Allowing an administrative agency to authoritatively interpret the law raises the possibility that our deference doctrine has allowed some part of the state's judicial power to take up residence in the executive branch of government. To discover whether it did, we must first get our bearings on the nature and extent of judicial power. We had occasion to dwell on this subject at some length just last term. See generally Gabler v. Crime Victims Rights Bd., 2017 WI 67, 376 Wis. 2d 147, 897 N.W.2d 384. There is no need to recreate Gabler's thorough analysis, so we will content ourselves with referencing only those parts that illuminate our work here.

¶44 The "separation of powers" doctrine informs our understanding of how the constitution allocates governmental power amongst its constituent branches.[28] This fundamental principle of American constitutional government was "established at the founding of our nation and enshrined in the structure of

---

[27] "This court has recognized, however, that the constitution does not define legislative, executive or judicial power . . . ." State v. Holmes, 106 Wis. 2d 31, 42–43, 315 N.W.2d 703 (1982).

[28] The executive and legislative branches have their own explicit grants of power under our constitution. Wis. Const. art. V, § 1 (providing that "[t]he executive power shall be vested in a governor"); Wis. Const. art. IV, § 1 (stating that "[t]he legislative power shall be vested in a senate and assembly").

the United States Constitution," and "inform[s] our understanding of the separation of powers under the Wisconsin Constitution." Gabler, 376 Wis. 2d 147, ¶11; Flynn v. DOA, 216 Wis. 2d 521, 545, 576 N.W.2d 245 (1998) ("The doctrine of separation of powers is implicitly found in the tripartite division of government [among] the judicial, legislative and executive branches."); Goodland v. Zimmerman, 243 Wis. 459, 466-67, 10 N.W.2d 180 (1943) ("It must always be remembered that one of the fundamental principles of the American constitutional system is that governmental powers are divided among the three departments of government, the legislative, the executive, and judicial, and that each of these departments is separate and independent from the others except as otherwise provided by the constitution."); Rules of Court Case, 204 Wis. 501, 503, 236 N.W. 717 (1931) ("It is, of course, elementary that we are committed by constitution to the doctrine of separation of powers.").

¶45 We must be assiduous in patrolling the borders between the branches. This is not just a practical matter of efficient and effective government. We maintain this separation because it provides structural protection against depredations on our liberties. The Framers of the United States Constitution understood that "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 324 (James Madison) (Jacob Cooke ed., 1961). Consequently, "[a]s Madison explained when

31

advocating for the Constitution's adoption, neither the legislature nor the executive nor the judiciary 'ought to possess, directly or indirectly, an overruling influence over the others in the administration of their respective powers.'" Gabler, 376 Wis. 2d 147, ¶4 (quoting The Federalist No. 48, at 305 (James Madison) (Clinton Rossiter ed., 1961)). "The purpose of the separation and equilibration of powers in general," said Justice Antonin Scalia, "was not merely to assure effective government but to preserve individual freedom."[29] Morrison v. Olson, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting). To this day, "[a]fter more than two hundred years of constitutional governance, th[is] tripartite separation of independent governmental power remains the bedrock of the structure by which we secure liberty in both Wisconsin and the United States." Gabler, 376 Wis. 2d 147, ¶3. As United States Supreme Court Justice Joseph Story said, "the three great powers of government . . . should for ever be kept separate and distinct." Id. (quoting 2 Joseph Story, Commentaries on the Constitution of the United States § 519, at 2-3 (Boston: Hilliard, Gray, & Co., 1833)).

---

[29] See also Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (stating that "the Constitution diffuses power the better to secure liberty"). Centuries earlier, the French writer Montesquieu said "there is no liberty, if the judiciary power be not separated from the legislative and executive." Charles de Secondat Montesquieu, The Spirit of Laws bk. XI, at 152 (Thomas Nugent trans., The Colonial Press rev. ed. 1900) (1748).

¶46 The constitution does not, however, hermetically seal the branches from each other. The separation of powers doctrine "envisions a system of separate branches sharing many powers while jealously guarding certain others, a system of 'separateness but interdependence, autonomy but reciprocity.'" State ex rel. Friedrich v. Circuit Court for Dane Cty., 192 Wis. 2d 1, 14, 531 N.W.2d 32 (1995) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). "The constitutional powers of each branch of government fall into two categories: exclusive powers and shared powers." State v. Horn, 226 Wis. 2d 637, 643, 594 N.W.2d 772 (1999). "Shared powers lie at the intersections of these exclusive core constitutional powers," and "[t]hese '[g]reat borderlands of power' are not exclusive to any one branch." Id. at 643-44 (quoting Friedrich, 192 Wis. 2d at 14); see also State v. Holmes, 106 Wis. 2d 31, 42-43, 315 N.W.2d 703 (1982). Although the "branches may exercise [shared] power within these borderlands," they "may [not] unduly burden or substantially interfere with another branch." Horn, 226 Wis. 2d at 644.

¶47 Core powers, however, are not for sharing. "Each branch has exclusive core constitutional powers, into which the other branches may not intrude." Flynn, 216 Wis. 2d at 545. "For more than a century, this court has been called upon to resist attempts by other branches of government to exercise authority in an exclusively judicial area." In re Complaint Against Grady, 118 Wis. 2d 762, 778, 348 N.W.2d 559 (1984).

33

These "[c]ore zones of authority are to be 'jealously guarded' by each branch of government, . . . ." Gabler, 376 Wis. 2d 147, ¶31 (quoting Barland v. Eau Claire Cty., 216 Wis. 2d 560, 573, 575 N.W.2d 691 (1998)). The importance of constitutional limitations, Chief Justice Marshall once said, is that they compel restraint when restraint is not desired: "To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?" Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176 (1803).

¶48 The separation of powers prevents us from abdicating core power just as much as it protects the judiciary from encroachment by other branches. "It is . . . fundamental and undeniable that no one of the three branches of government can effectively delegate any of the powers which peculiarly and intrinsically belong to that branch." Rules of Court Case, 204 Wis. at 503; see also id. (stating that "any attempt to abdicate [a core power] in any particular field, though valid in form, must, necessarily, be held void" (internal quotation mark omitted) (quoting State ex rel. Mueller v. Thompson, 149 Wis. 488, 491-92, 137 N.W. 20 (1912))). Even if we truly wished to abandon some aspect of our core power, no other branch may take it up and use it as its own. "As to these areas of authority, . . . any exercise of authority by another branch of government is unconstitutional." Gabler, 376 Wis. 2d 147, ¶31 (internal quotation mark omitted) (quoting State ex rel. Fiedler v. Wis. Senate, 155 Wis. 2d 94, 100, 454 N.W.2d 770 (1990))

34

(emphasis in original); see also Town of Holland v. Vill. of Cedar Grove, 230 Wis. 177, 190, 282 N.W. 111 (1938) ("This court has repeatedly held that the judicial power vested by the constitution in the courts cannot be exercised by administrative or executive agencies.").

¶49 The propriety of our deference doctrine, therefore, depends on whether it transfers to a coordinate branch of government a quantum of our core powers. To make that determination, we need to describe those powers well enough that, if they are present in our deference doctrine, we will recognize them.

¶50 From the earliest days of our country, we have understood that the judiciary's first and irreducible responsibility is to proclaim the law: "It is emphatically the province and duty of the judicial department to say what the law is." Marbury, 5 U.S. at 177. The process of interpreting the law in a specific case is part of that central duty: "Those who apply the rule to particular cases, must of necessity expound and interpret that rule." Id. We agreed with Marbury just a few years ago when we described our judicial power as "the ultimate adjudicative authority of courts to finally decide rights and responsibilities as between individuals." State v. Williams, 2012 WI 59, ¶36, 341 Wis. 2d 191, 814 N.W.2d 460.

¶51 It is fair to say that exercising judgment in the interpretation and application of the law in a particular case is the very thing that distinguishes the judiciary from the other branches:

35

> The judiciary . . . has no influence over either the sword or the purse, no direction either of the strength or of the wealth of the society, and can take no active resolution whatever.  It may truly be said to have neither Force nor Will, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments.

The Federalist No. 78, at 523 (Alexander Hamilton) (Jacob Cooke ed., 1961).  We, too, have said as much:  "By vesting the judicial power in a unified court system, the Wisconsin Constitution entrusts the judiciary with the duty of interpreting and applying laws made and enforced by coordinate branches of state government."  <u>Gabler</u>, 376 Wis. 2d 147, ¶37; <u>see also</u> <u>State v. Van Brocklin</u>, 194 Wis. 441, 443, 217 N.W. 277 (1927) ("Judicial power is that power which adjudicates and protects the rights and interests of individual citizens, and to that end construes and applies the laws." (quoted source omitted)).

¶52 Some would argue that the judiciary's law-declaring and law-applying power lies not at the core of what it means to be a court, but somewhere out on the periphery of our powers where we share it with the executive branch.  Some of our older cases have spoken in terms that lend this proposition at least some superficial plausibility.  For example, in <u>State ex rel. Wisconsin Inspection Bureau v. Whitman</u> we said:

> Every executive officer in the execution of the law must of necessity interpret it in order to find out what it is he is required to do.  While his interpretation is not final, yet in the vast majority of cases it is the only interpretation placed upon it, and as long as it is acquiesced in it becomes the official interpretation which the courts heed and in

36

which they oftentimes acquiesce as a practical construction.

196 Wis. 472, 497, 220 N.W. 929 (1928); see also Rules of Court Case, 204 Wis. at 504 (same) (quoting this portion of Whitman). And even earlier, we had noted the quasi-judicial nature of some administrative bodies:

> We do not consider the Industrial Commission a court, nor do we construe the act as vesting in the Commission judicial powers within the meaning of the constitution. It is an administrative body or arm of the government which in the course of its administration of a law is empowered to ascertain some questions of fact and apply the existing law thereto, and in so doing acts quasi-judicially, but it is not thereby vested with judicial power in the constitutional sense.

Borgnis v. Falk Co., 147 Wis. 327, 358, 133 N.W. 209 (1911) (emphasis in original).

¶53 But these cases cannot bear the weight their proponents assign them. The executive must certainly interpret and apply the law; it would be impossible to perform his duties if he did not. After all, he must determine for himself what the law requires (interpretation) so that he may carry it into effect (application). Our constitution not only does not forbid this, it requires it. Wis. Const. art. V, § 1 ("The executive power shall be vested in a governor, . . . ."); Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1217 (2015) (Thomas, J., concurring) ("It is undoubtedly true that the other branches of Government have the authority and obligation to interpret the law, . . . ."). But this comprises interpretation and application within the executive branch. We are here concerned

37

with the authoritative interpretation and application of the law as applied to a particular case <u>within the judicial branch</u>. "[O]nly the judicial interpretation [as opposed to interpretations offered by the other branches] would be considered authoritative in a judicial proceeding." <u>Perez</u>, 135 S. Ct. at 1217 (Thomas, J., concurring). Even <u>Rules of Court Case</u> and <u>Whitman</u> recognize that the executive's understanding of the law is provisional, and that it gains a measure of permanence only through habit and inertia. See <u>Rules of Court Case</u>, 204 Wis. at 504; <u>Whitman</u>, 196 Wis. at 497 ("While [the executive's] interpretation is not final, yet in the vast majority of cases it is the only interpretation placed upon it, . . . in which [the courts] oftentimes acquiesce as a practical construction."). We do not understand <u>Borgnis</u> to say anything different. There, we recognized that the work of some administrative agencies looks very similar to that of the courts. We described the power they exercised as "quasi judicial," but it was "quasi" rather than simply "judicial" because they had no power to impose their understanding of the law on the judiciary's resolution of a particular case.[30]

---

[30] Justice Ann Walsh Bradley suggests we have committed "legal error" and ignored "controlling precedent." Justice Ann Walsh Bradley's concurrence, ¶¶111, 115. Presumably, she is referring to the observation in <u>Borgnis</u> that "a board may lawfully be endowed with very broad powers, and its conclusions may be given great dignity and force, so that courts may not reverse them unless the proof be clear and satisfactory that they are wrong." See <u>Borgnis v. Falk Co.</u>, 147 Wis. 327, 359, 133 N.W. 209 (1911). As an initial matter, it is not clear whether <u>Borgnis</u> was here referring to findings of fact or

(continued)

¶54 When we distill our cases and two centuries of constitutional history to their essence, the result is a lodestar that leads us directly to the most central of our powers: "No aspect of the judicial power is more fundamental than the judiciary's exclusive responsibility to exercise judgment in cases and controversies arising under the law." Gabler, 376 Wis. 2d 147, ¶37; see also Operton, 375 Wis. 2d 1, ¶73 (R. Grassl Bradley, J., concurring) (indicating that "the court's duty to say what the law is" constitutes a "core judicial function"); In re Appointment of Revisor, 141 Wis. 592, 598, 124 N.W. 670 (1910) (stating that "it is the exclusive function of the courts to expound the laws"). Judgment, of course, encompasses interpreting and applying the law to the case sub judice. Marbury, 5 U.S. at 177 ("Those who apply the rule to particular cases, must of necessity expound and interpret that rule."); The Federalist No. 78, at 525 (Alexander Hamilton) (Jacob Cooke ed., 1961) ("The interpretation of the laws is the proper and peculiar province of the courts.");

---

conclusions of law. If the former, this opinion does not tread on those grounds. If the latter, then Borgnis would be counted amongst those cases with which we treat today. If we choose to overrule it we risk aspersions on our wisdom, but not legal error. Nor would we be ignoring controlling precedent. The doctrine the case espouses is our own, and is, therefore, unquestionably within our remit to accept or reject without committing legal error. And because the case itself is our own, it is impossible for it to control our decision. Stare decisis is a critical rule that promotes stability by ensuring we do not abandon precedent for light or transient reasons. But it is not a limitation on our authority.

Roggensack, supra ¶18, at 547 (stating that "[d]eclaring what a statute means is a core function of the courts").  We conclude that only the judiciary may authoritatively interpret and apply the law in cases before our courts.  The executive may not intrude on this duty, and the judiciary may not cede it.  If our deference doctrine allows either, we must reject it.

### 4.  "Great Weight" Deference Considered

¶55 We see our core judicial powers lying at the heart of "great weight" deference.  When the doctrine's preconditions are satisfied, that is, when an administrative agency meets the four Harnischfeger criteria, we cede to the agency the power to authoritatively interpret the law ("an agency's interpretation must then merely be reasonable for it to be sustained," Harnischfeger, 196 Wis. 2d at 661), and apply the law to the case before us ("the courts should not substitute their judgment for the agency's application of a particular statute to the found facts," Pabst, 19 Wis. 2d at 323-24 (emphasis added)).  Because Harnischfeger made this a structural piece of the standard by which we review an agency's decision, we arrive at the legal issues involved in the case with an a priori commitment to letting the agency decide them.  But Marbury and Gabler say the power to interpret and apply the law in the case at bar is an exclusively judicial power.  Therefore, because that power belongs to the judiciary——and the judiciary alone——we may not allow an administrative agency to exercise it.

¶56 We provide guardrails for an administrative agency's exercise of our power, to be sure, but they are minimal.  Under

great weight deference, we simply require that the agency's judgment on the law not overrule our precedents, violate the constitution, contradict legislative history, or be unreasonable.[31]  Within those expansive boundaries, however, the agency is the master of statutory construction and application, and it occupies the field to the exclusion of the judiciary.[32] We reserve a sufficient quantum of judicial power to set the guardrails, but that gives no good answer to the charge that this doctrine cedes something that belongs exclusively to the judiciary.  We are concerned here with categories of power, not quantity.  Regardless of the circumscriptions we put in place, when we defer we are allowing the agency to exercise what is unmistakably core judicial power.

¶57 Chief Justice Roggensack has been particularly incisive in describing the practical problems this deference causes.  She has observed that "[w]hat decision-avoidance doctrines accomplish is to relieve the court of the real work of judicial review, what has been described as the 'burden of

---

[31] We will defer if "a rational basis exists in law for the agency's interpretation and it does not conflict with the statute's legislative history, prior decisions of this court, or constitutional prohibitions."  Bucyrus-Erie Co. v. DILHR, 90 Wis. 2d 408, 417, 280 N.W.2d 142 (1979) (quoting Pabst v. Wis. Dep't of Taxation, 19 Wis. 2d 313, 324, 120 N.W.2d 77 (1963)).

[32] When great weight deference applies, a reviewing court must accept "an agency's reasonable statutory interpretation, even if the court concludes that another interpretation is equally reasonable, or even more reasonable, than that of the agency."  Racine Harley-Davidson, Inc. v. Wis. Div. of Hearings & Appeals, 2006 WI 86, ¶17, 292 Wis. 2d 549, 717 N.W.2d 184.

41

reasoned decisionmaking.'" Roggensack, supra ¶18, at 546 (quoted source omitted). And it privileges unelected executive-branch employees over those the people of Wisconsin elected to resolve questions of law.

> When the court employs judicially created doctrines that limit the scope of its review instead of applying the collective knowledge that the seven justices were elected to exercise, it avoids the real work of appellate decision making: explaining to the public why the application of the law to the facts of the case resulted in the court's decision and why that result is fair under the law.

Roggensack, supra ¶18, at 560.

¶58 The abdication of core judicial power to the executive is a concern not just of our court, but of the federal judiciary as well. Wisconsin's separation of powers is a reflection of that found in the United States Constitution, which provides (in relevant part) that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1.[33] Whereas our decision in Harnischfeger made us structurally deferential to administrative agencies, Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc. accomplished something very similar for the federal courts. 467 U.S. 837, 843 (1984). In

---

[33] "The executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1.

42

reviewing an administrative agency's interpretation and application of a statute, the Supreme Court said:

> [T]he court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Id. (footnote omitted). The Court, it observed, "ha[s] long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations has been consistently followed by this Court . . . ." Id. at 844 (footnote omitted) (internal mark and quoted source omitted).

¶59 Jurists in federal courts have expressed the same concern with Chevron deference as we have with Harnischfeger deference. Justice Clarence Thomas directly questioned the constitutionality of deferring to an administrative agency's interpretation of the law in Michigan v. Environmental Protection Agency, 135 S. Ct. 2699, 2712 (2015) (Thomas, J., concurring). The EPA's request for deference, he said, "raises serious questions about the constitutionality of our broader practice of deferring to agency interpretations of federal statutes." Id. He was concerned that this deference allowed the judiciary to escape its responsibility to independently resolve questions of law: "[T]he judicial power, as originally understood, requires a court to exercise its independent

43

judgment in interpreting and expounding upon the laws." Id.
(quoting Perez, 135 S. Ct. at 1217 (Thomas, J., concurring))
(alteration in original). Yet, "Chevron deference precludes
judges from exercising that judgment, forcing them to abandon
what they believe is 'the best reading of an ambiguous statute'
in favor of an agency's construction." Michigan, 135 S. Ct. at
2712 (Thomas, J., concurring) (quoting Nat'l Cable & Telecomm.
Ass'n v. Brand X Internet Servs., 545 U.S. 967, 983 (2005)).
This "wrests from Courts the ultimate interpretative authority
to 'say what the law is,' Marbury v. Madison, 1 Cranch 137, 177,
2 L.Ed. 60 (1803), and hands it over to the Executive."
Michigan, 135 S. Ct. at 2712 (Thomas, J., concurring). Such a
transfer of power, he concluded, "is in tension with Article
III's Vesting Clause, which vests the judicial power exclusively
in Article III courts, not administrative agencies." Id.
(citing U.S. Const. art. III, § 1).

¶60 Justice Antonin Scalia was equally concerned with the
possible abandonment of judicial power to the executive branch.
Although he supported Chevron's imprimatur on the executive's
authority to adopt policy-making regulations to fill up
interstitial statutory silences, his approval did not extend to
an agency's authority to make binding pronouncements on the law:

> I suppose it is harmless enough to speak about "giving
> deference to the views of the Executive" concerning
> the meaning of a statute, just as we speak of "giving
> deference to the views of the Congress" concerning the
> constitutionality of particular legislation——the
> mealy-mouthed word "deference" not necessarily meaning
> anything more than considering those views with

44

attentiveness and profound respect, before we reject them. But to say that those views, if at least reasonable, will ever be <u>binding</u>——that is, seemingly, a striking abdication of judicial responsibility.

The Honorable Antonin Scalia, <u>Judicial Deference to Administrative Interpretations of Law</u>, 1989 Duke L.J. 511, 513-14 (1989). <u>Chevron</u> deference eventually spawned <u>Auer</u> deference, which requires federal courts to prefer an agency's interpretation of its regulations over the court's own interpretation.[34] This, Justice Scalia believed, was a mistake because of its effect on a court's authority to decide questions of law:

> I would therefore restore the balance originally struck by the APA with respect to an agency's interpretation of its own regulations, not by rewriting the Act in order to make up for <u>Auer</u>, but by abandoning <u>Auer</u> and applying the Act as written. The agency is free to interpret its own regulations with or without notice and comment; but courts will decide——with no deference to the agency——whether that interpretation is correct.

<u>Perez</u>, 135 S. Ct. at 1213 (Scalia, J., concurring). And he understood that <u>Chevron</u> was what made it possible: "The problem is bad enough, and perhaps insoluble if <u>Chevron</u> is not to be uprooted, with respect to interpretive rules setting forth agency interpretation of statutes." <u>Perez</u>, 135 S. Ct. at 1212.

¶61 Justice Neil Gorsuch, when he was on the Tenth Circuit Court of Appeals, elegantly summarized how deference to administrative agencies hollows out a court's judicial power:

---

[34] <u>See</u> <u>Auer v. Robbins</u>, 519 U.S. 452 (1997).

45

Yet, rather than completing the task expressly assigned to us, rather than "interpret[ing] . . . statutory provisions," [5 U.S.C. § 706] declaring what the law is, and overturning inconsistent agency action, Chevron step two tells us we must allow an executive agency to resolve the meaning of any ambiguous statutory provision. In this way, Chevron seems no less than a judge-made doctrine for the abdication of the judicial duty. Of course, some role remains for judges even under Chevron. At Chevron step one, judges decide whether the statute is "ambiguous," and at step two they decide whether the agency's view is "reasonable."

Gutierrez-Brizuela v. Lynch, 834 F.3d 1142, 1151–52 (10th Cir. 2016) (Gorsuch, J., concurring) (brackets in original). What he said of Chevron is equally true of Harnischfeger: "But where in all this does a court interpret the law and say what it is? When does a court independently decide what the statute means and whether it has or has not vested a legal right in a person? Where Chevron applies that job seems to have gone extinct." Gutierrez-Brizuela, 834 F.3d at 1152 (Gorsuch, J., concurring).[35]

---

[35] Justice Ann Walsh Bradley does not believe our deference doctrine cedes our core judicial power to administrative agencies: "[C]ontrary to the majority/lead opinion's assertion, agency deference does not remove from the court its interpretive role and cede it to the agency." Justice Ann Walsh Bradley's concurrence, ¶119. She says we still must engage in the exercise of statutory construction so that we may compare our interpretation to the agency's because "[o]nly reasonable interpretations are worthy of deference." See id. Yes, but that says nothing about whose "reasonable interpretation" controls the case. If we interpret a statute for ourselves, but then set it aside in favor of the agency's interpretation, we have ceded our authority. The point of the interpretive exercise is not to see if we are as good at it as an administrative agency; it is to apply the results of our efforts to the case before us. If we fail to do that, then we have failed to act as a court.

46

¶62 Indeed, it has. And that presents a related, and equally serious problem.

*

¶63 Ceding judicial power to an administrative agency is, from a separation of powers perspective, unacceptably problematic; it is problematic along a different axis when that agency appears in our courts as a party. The non-agency party may reasonably ask whether our deference doctrine will deprive him of an impartial decisionmaker's exercise of independent judgment, and, thereby, the due process of law.[36]

¶64 The United States Supreme Court says that a "fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955). We have remarked that this proposition is so plain as to be axiomatic. State v. Herrmann, 2015 WI 84, ¶25, 364 Wis. 2d 336, 867 N.W.2d 772. But there cannot be a fair trial without a constitutionally acceptable decisionmaker: "It is, of course, undisputable that a minimal rudiment of due process is a fair and impartial decisionmaker." Guthrie v. WERC, 111 Wis. 2d 447, 454, 331 N.W.2d 331 (1983). Our commitment to this principle is such that we do not accept even the appearance of bias: "[W]hen

---

[36] "Procedural due process under the Fourteenth Amendment to the United States Constitution and Article I, Section 1 of the Wisconsin Constitution protect against government actions that deprive an individual of life, liberty, or property without due process of the law." Adams v. Northland Equip. Co., 2014 WI 79, ¶64, 356 Wis. 2d 529, 850 N.W.2d 272.

47

determining whether a defendant's right to an objectively impartial decisionmaker has been violated we consider the appearance of bias in addition to actual bias. When the appearance of bias reveals a great risk of actual bias, the presumption of impartiality is rebutted, and a due process violation occurs." Herrmann, 364 Wis. 2d 336, ¶46. Therefore, a biased decisionmaker is "constitutionally unacceptable." Withrow v. Larkin, 421 U.S. 35, 47 (1975).[37]

¶65 We have already concluded that our deference doctrine cedes to administrative agencies some of our exclusive judicial powers. It necessarily follows that when that agency comes to us as a party in a case, it——not the court——controls some part of the litigation. When questions of law arise, the court serves as a gatekeeper to adjudge compliance with the Harnischfeger prerequisites. But once the court completes that task, it receives instruction from the governmental party on how to interpret and apply the rule of decision.

¶66 When a court defers to the governmental party, simply because it is the government, the opposing party is unlikely to

_____

[37] Our Code of Judicial Conduct reflects the foundational importance of keeping core judicial power in the hands of an independent judiciary: "Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us." SCR ch. 60, Preamble. The comment to the first rule (SCR 60.02) says that our institutional legitimacy depends on this principle. "Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of the judges." SCR 60.02 cmt.

48

be mollified with assurances that the court bears him no personal animus as it does so.[38] The injury arises not from the reason the court favors one party over another, but from the fact that the court has a favorite at all.[39] As Professor Phillip Hamburger observed, "when judges defer to the executive's view of the law, they display systematic bias toward one of the parties." Philip Hamburger, Chevron Bias, 84 Geo. Wash. L. Rev. 1187, 1212 (2016). Harnischfeger deference, like Chevron deference, "is an institutionally declared and thus systematic precommitment in favor of the government." Cf. Hamburger, supra ¶66, at 1211.

¶67 This systematic favor deprives the non-governmental party of an independent and impartial tribunal. Justice David Prosser sounded the alarm on this issue in Hilton ex rel. Pages Homeowners' Association v. DNR, 2006 WI 84, ¶¶54-55, 293 Wis. 2d 1, 717 N.W.2d 166 (Prosser, J., concurring). When great weight deference applies, he said, "[t]he supreme court and other Wisconsin courts are expected to rationalize and rubberstamp the agency's decision unless the agency's legal

---

[38] "The danger to independent judgment arises whenever judges relinquish their judgment in any degree, and the danger of systematic bias arises whenever judges show greater respect for the legal position of one party than that of the other." Philip Hamburger, Chevron Bias, 84 Geo. Wash. L. Rev. 1187, 1202 (2016).

[39] "Of course, the bias arises from institutional precedent rather than individual prejudice, but this makes the bias especially systematic and the Fifth Amendment due process problem especially serious." Id. at 1189.

interpretation is plainly wrong. The result is that many litigants have lost their right to a decision by an <u>independent</u> judiciary." <u>Id.</u>; <u>see also</u> <u>Gabler</u>, 376 Wis. 2d 147, ¶39 (indicating that "[i]f the judiciary passively permits [the executive] branch to arrogate judicial power unto itself, however estimable the professed purpose for asserting this prerogative, the people inevitably suffer" because they lose "their independent arbiters of the law"); Roggensack, <u>supra</u> ¶18, at 546 ("Indeed, some writers who have examined judicially created decision-avoidance doctrines have stated that when 'the scope of review is too limited, the right to review itself becomes meaningless.'" (quoted source omitted)).

¶68 The situation appears no better when considered from the agency's perspective. When an administrative agency interprets and applies the law in a case to which it is a party, it is to that extent acting as judge of its own cause. By the time the Framers condemned such an arrangement, the rationale had already been a part of our wisdom literature for centuries:

> No man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity. With equal, nay with greater reason, a body of men, are unfit to be both judges and parties, at the same time; . . . .

The Federalist No. 10, at 59 (James Madison) (Jacob Cooke ed., 1961).[40] Echoing Madison, the United States Supreme Court said that "no man can be a judge in his own case[,] and no man is permitted to try cases where he has an interest in the outcome." In re Murchison, 349 U.S. at 136.

¶69 An administrative agency has an obvious interest in the outcome of a case to which it is a party. Yet, our deference doctrine commits the rule of decision to its hands anyway. It is entirely unrealistic to expect the agency to function as a "fair and impartial decisionmaker" as it authoritatively tells the court how to interpret and apply the law that will decide its case. Because it cannot do so, deference threatens the most elemental aspect of a fair trial.[41] Guthrie, 111 Wis. 2d at 454 ("[A] minimal rudiment of due process is a fair and impartial decisionmaker."). This is not to question the agency's good faith, which we presume. It is

---

[40] Sir Edward Coke said "it is a maxime in law, aliquis non debet esse judex in propria causa." 1 Edward Coke, Institutes of the Laws of England § 212 (James & Luke G. Hansard & Sons 19th ed. 1832) (1628). He said so in English, too: "[I]t is against reason, that if wrong be done any man, that he thereof should be his own judge." Id.; see also Dr. Bonham's Case, 77 Eng. Rep. 646, 652, 8 Co. Rep. 113 (1610) (in which Sir Coke applied this maxim).

[41] This is not to say an administrative agency cannot satisfy the due process requirement of an impartial decisionmaker as it decides contested cases within the executive branch. And nothing in our opinion today should be understood to question that.

51

merely to join with the ancients in recognizing that no one can be impartial in his own cause.

*

¶70 As a postscript to this issue, it is worth recalling that great weight deference is a creature of our own making——that is, nothing in our statutes called it into being. If anything, the relevant provision under which we normally review agency decisions militates against it. Subsection 227.57(5) says:

> The court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law.

Wis. Stat. § 227.57(5). This says nothing about comparing our interpretation of the law to that of the agency, or gatekeeping, or reasonableness. Instead, the statute says the court is to decide whether the agency has "erroneously interpreted a provision of law." Id. And the court is to determine the "correct interpretation of the provision of law." Id. This formulation recognizes the proper residence of our core judicial powers.

### 5. "Due Weight" Deference Considered

¶71 "Due weight," as a principle, entered our jurisprudence through a statute, but over time our cases grafted it into the administrative deference doctrine. The original statutory foundation, however, is still there, and is just as

52

viable as it was before. Today, we restore the principle of "due weight" to its original form by removing the patina of "deference" with which our cases have covered it.

¶72 It is true that due weight deference presents a threat to our core powers that is less extensive than that presented by great weight deference. It has been said that "in most situations, applying due weight deference will lead to the same result as would applying no deference at all." MercyCare Ins. Co. v. Wis. Comm'r of Ins., 2010 WI 87, ¶37, 328 Wis. 2d 110, 786 N.W.2d 785; see also Operton, 375 Wis. 2d 1, ¶22 ("We note here that there is little difference between due weight deference and no deference, since both situations require us to construe the statute ourselves." (internal quotation mark omitted) (quoting Cty. of Dane v. LIRC, 2009 WI 9, ¶19, 315 Wis. 2d 293, 759 N.W.2d 571)).

¶73 The threat presented by due weight deference is less, however, only in the sense that the preconditions that justify the agency's exercise of our exclusive power are fulfilled more rarely. When the "due weight" preconditions are satisfied,[42] we must defer to the agency when our respective views of the law,

---

[42] The preconditions are that: (1) "the statute is one that the agency was charged with administering"; and (2) "the agency has at least some expertise in the interpretation of the statute in question." Operton, 375 Wis. 2d 1, ¶20 (quoting Racine Harley-Davidson, Inc., 292 Wis. 2d 549, ¶107 (Roggensack, J., concurring) (internal quotation mark omitted)).

while different, are equally reasonable.[43] When there is equipoise, the court cedes its core judicial power just as surely as if great weight deference had applied. Infrequency does not make the cession appropriate.

¶74 Nor does cession become acceptable because the agency has less latitude in exercising our power under due weight deference than it does under great weight deference. In Racine Harley-Davidson, Inc., 292 Wis. 2d 549, ¶¶14-15, we suggested that granting deference did not abandon our judicial power because we retained the authority to establish the guardrails within which the agency exercised that power. See id. (emphasizing that the court decides "whether deference is due," "what level of deference is due," and "the reasonableness of the agency interpretation"). But providing the agency with even the most exacting tutelage on how to exercise our power does not change the fact that it is exercising our power. It is the fact of cession, not its frequency or latitude, that implicates separation of powers and due process concerns. The power within the guardrails is part of our core, and so we may not parcel it out in even the smallest of doses. Therefore, due weight deference and great weight deference are structurally unsound for the same reasons.

*

_____

[43] See UFE Inc., 201 Wis. 2d at 287 n.3 (stating that under due weight deference, "an equally reasonable interpretation of a statute should not be chosen over the agency's interpretation").

¶75 On the other hand, "due weight"——in its statutory form——presents no such concerns.   There are five provisions in Wis. Stat. § 227.57 that address how we handle questions of law in reviewing an agency's decision:

> (3) The court shall separately treat disputed issues of agency procedure, interpretations of law, determinations of fact or policy within the agency's exercise of delegated discretion.
>
>        . . . .
>
> (5) The court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law.
>
>        . . . .
>
> (8) The court shall reverse or remand the case to the agency if it finds that the agency's exercise of discretion is . . . in violation of a constitutional or statutory provision; . . . .
>
>        . . . .
>
> (10) Subject to sub. (11), upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it.
>
> (11) Upon review of an agency action or decision affecting a property owner's use of the property owner's property, the court shall accord no deference to the agency's interpretation of law if the agency action or decision restricts the property owner's free use of the property owner's property.

Wis. Stat. § 227.57(3), (5), (8), (10)-(11).

¶76 None of these provisions direct us to defer to an agency's interpretation or application of the law.  To the contrary, subsection (3) tells us to treat questions of law separately from all other matters in the case (reminiscent of the analytical approach mentioned in Pabst); subsection (5) recognizes the court, not the agency, as the law-declaring body; and subsection (8) calls for us to test an agency's exercise of discretion against relevant constitutional and statutory provisions (without any suggestion that the agency is to decide what those provisions mean).

¶77 We find the legislature's commendation of administrative agencies in subsection (10).  There, we learn we are to give "due weight" (subject to subsection (11)——more about that later) to the "experience, technical competence, and specialized knowledge of the agency involved."  From our earliest days we have recognized that the state's agencies develop a valuable perspective, unique to them, as they administer the laws within their portfolios. See Harrington, 28 Wis. at 69 (finding it significant that "the office of attorney general ha[d] been filled by nine different individuals, all of them gentlemen of learning and accomplishment in their profession"); see also Motor Transp. Co. v. Pub. Serv. Comm'n, 263 Wis. 31, 43, 56 N.W.2d 548 (1953) (recognizing that "the Public Service Commission possesses wide experience and much technical knowledge in the field of regulation of motor-carrier transportation of property").  It was, in fact, our appreciation for that collected wisdom that originally led to our deference

56

doctrine. See Roggensack, supra ¶18, at 557 (referring to the "oft-cited foundation for deferring to agency decisions, administrative expertise").

¶78 Recognizing that administrative agencies can sometimes bring unique insights to the matters for which they are responsible, however, does not mean we should defer to them. And there is nothing in Wis. Stat. § 227.57(10) that suggests we should. We believe the Department accurately described the meaning and effect of this provision. It acknowledged that giving "due weight" to an agency's experience, technical competence, and specialized knowledge will not "oust the court as the ultimate authority or final arbiter" of the law. Instead, it said, "due weight" means giving "respectful, appropriate consideration to the agency's views" while the court exercises its independent judgment in deciding questions of law. We agree. "Due weight" is a matter of persuasion, not deference.

¶79 But "due weight" is not a talisman that automatically grants its bearer additional rhetorical power. If an agency brings to court nothing but a rote recitation of its background with the subject matter, it should not expect the statutory directive to give its argument extra heft. The agency should be prepared to explain how its experience, technical competence, and specialized knowledge give its view of the law a significance or perspective unique amongst the parties, and why that background should make the agency's view of the law more persuasive than others. As we assess the persuasiveness of the

agency's perspective, we will consider the same types of factors that formerly informed our deference doctrine, to wit: (1) whether the legislature made the agency responsible for administering the statute in question; (2) the length of time the administrative agency's interpretation has stood; (3) the extent to which the agency used its expertise or specialized knowledge in developing its position; and (4) whether the agency's perspective would enhance uniformity and consistency of the law.

¶80 Before concluding our "due weight" analysis, we must still account for the effect of Wis. Stat. § 227.57(11). This provision says that "[u]pon review of an agency action or decision affecting a property owner's use of the property owner's property, the court shall accord no deference to the agency's interpretation of law if the agency action or decision restricts the property owner's free use of the property owner's property." § 227.57(11). The plain meaning of this subsection is that the court should forswear deference to an agency's interpretation of the law in the identified circumstances. The legislature added this subsection in 2015, and simultaneously made subsection (10) subject to its provisions. 2015 Wis. Act 391, §§ 30, 31. By doing so, the legislature necessarily implied that it understood subsection (10) as allowing the court to defer to an agency's interpretation of law. Even though the text of that subsection says nothing about deference, there was good reason to understand it that way. By the time subsection (11) entered the statutes, our treatment of both

58

"great weight" and "due weight" had long since matured into our current deference doctrine. Adding subsection (11), therefore, exempted the identified circumstances not from a statutory command, but from the decision-avoidance effects of our deference doctrine. Consequently, we understand subsection (11) as a partial dismantling of our deference doctrine. Our decision today completes the process.

¶81 By returning "due weight" to its statutory roots, and ending our erstwhile deference, we honor the requirements of Wis. Stat. § 227.57(10), the separation of powers, and the parties' due process interests. We agree with now-Justice Gorsuch's observations about the benefits of rejecting decision-avoidance doctrines like ours:

> [D]e novo judicial review of the law's meaning would limit the ability of any agency to alter and amend existing law. It would avoid the due process and equal protection problems of the kind documented in our decisions. It would promote reliance interests by allowing citizens to organize their affairs with some assurance that the rug will not be pulled from under them tomorrow, the next day, or after the next election.

Gutierrez-Brizuela, 834 F.3d at 1158 (Gorsuch, J., concurring).

6. Standard of Review

59

¶82 We are mindful that our decision today represents a significant break with the way we have reviewed agency decisions since at least Harnischfeger, and in some respects, since Pabst. The principle of stare decisis counsels that we depart from our precedents only when circumstances unavoidably superannuate our commitment to them. Typically, that occurs when:

> (1) [c]hanges or developments in the law have undermined the rationale behind a decision; (2) there is a need to make a decision correspond to newly ascertained facts; (3) there is a showing that the precedent has become detrimental to coherence and consistency in the law; (4) the prior decision is "unsound in principle;" or (5) the prior decision is "unworkable in practice."

Bartholomew v. Wis. Patients Comp. Fund, 2006 WI 91, ¶33, 293 Wis. 2d 38, 717 N.W.2d 216 (quoted source omitted).

¶83 We are leaving our deference doctrine behind because it is unsound in principle. It does not respect the separation of powers, gives insufficient consideration to the parties' due process interest in a neutral and independent judiciary, and "risks perpetuating erroneous declarations of the law." Operton, 375 Wis. 2d 1, ¶73 (R. Grassl Bradley, J., concurring). Although persistency of our precedents normally protects the rule of law, sometimes "[w]e do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision." See Johnson Controls, Inc. v. Emp'rs Ins. of Wausau, 2003 WI 108, ¶¶97, 100, 264 Wis. 2d 60, 665 N.W.2d 257.

¶84 Today, the core judicial power ceded by our deference doctrine returns to its constitutionally-assigned residence. Henceforth, we will review an administrative agency's conclusions of law under the same standard we apply to a circuit court's conclusions of law——de novo. See Mitchell Bank v. Schanke, 2004 WI 13, ¶24, 268 Wis. 2d 571, 676 N.W.2d 849 ("We review legal conclusions of the circuit court de novo."). As with judicial opinions, we will benefit from the administrative agency's analysis, particularly when they are supplemented by the "due weight" considerations discussed above. Cf. Megal Dev. Corp. v. Shadof, 2005 WI 151, ¶8, 286 Wis. 2d 105, 705 N.W.2d 645 ("While the review is de novo, this court benefits from the analyses of the circuit court and the court of appeals."). And, as always, we review the administrative agency's decision, not that of the circuit court. Ho-Chunk Nation v. DOR, 2009 WI 48, ¶12, 317 Wis. 2d 553, 766 N.W.2d 738 ("In a case that involves a ruling by the Commission, we review the Commission's decision rather than the decision of the circuit court."). The facts in this case are undisputed, so we address only questions of law. See Vogel v. Grant-Lafayette Elec. Co-op., 201 Wis. 2d 416, 422, 548 N.W.2d 829 (1996) ("Whether the facts of a particular case fulfill a legal standard is a question of law we review de novo.").

7. Discontinuing Deference for Administrative Reasons

¶85 We created our deference doctrine ex nihilo, and so it is within our power to end it simply by declaring it at an end. Some members of the court prefer that option——discard the

61

doctrine not because the constitutional problems require its abandonment, but merely because we have chosen to drop it. However, just because we can do this does not make it wise. Indeed, stare decisis exists as a principle for the sole purpose of counseling against that option.

¶86 Justice Gableman provided a thoughtful account of why he would end the deference doctrine on non-constitutional grounds. Ultimately, however, his rationale still depends on the separation of powers—sotto voce, to be sure, but undeniably. Thus, for example, he says our deference doctrine is unsound in principle because "deference (especially great weight deference), if correctly and honestly applied, leads to the perverse outcome of courts often affirming inferior interpretations of statutes." Justice Gableman's concurrence, ¶166. That is indubitably true. But it is true only if one already subscribes to the proposition that our interpretation enjoys pride of place over that of the administrative agency. We should not be surprised to learn, however, that an administrative agency might believe its own interpretation is superior to ours. Indeed, we should expect no less from an agency engaged in a good faith effort to do its job. From the agency's perspective, therefore, our deference doctrine creates no perversity at all; instead, it gives the statute the best possible interpretation: Its own. So when Justice Gableman says that "[i]n our role as court of last resort, we should

ensure that erroneous-but-reasonable legal conclusions are corrected,"[44] he is making a separation of powers assertion——to wit, the court is the authoritative arbiter of the law in the case before us, and our opinion must prevail over that of the other branches. Without that constitutional impetus, there is no fuel for his "unsound in principle" analysis.

¶87 Justice Gableman also says newly-ascertained facts provide a non-constitutional basis for ending deference.[45] Specifically, he notes that part of the justification for the doctrine was the assumed subject-matter expertise of the agency decision-makers. He questions whether they really do have such expertise, and then concludes: "We may say that it is only a matter of speculation that agency decision-makers possess less expertise than courts when it comes to interpreting various statutes. Importantly, it is equally a matter of speculation that they possess more."[46] So as Justice Gableman acknowledges, these are not newly-ascertained facts, they are newly-ascertained speculations. Our deference doctrine has defined the relationship between administrative agencies and the judiciary for over two decades now. Speculation about a hearing

---

[44] Justice Gableman's concurrence, ¶166.

[45] Id., ¶167.

[46] Id.

examiner's expertise seems an especially diaphanous justification for upending this settled history.[47]

¶88 The members of the court who would end our deference doctrine for administrative reasons do so out of a desire to avoid a constitutional analysis. But as Justice Gableman's concurrence demonstrates, it is impossible to describe a substantive reason for ending the doctrine without at least an unspoken appeal to constitutional principles. We do no good service by avoiding an analysis that so obviously demands our attention.

\*

¶89 Justice Ziegler would also prefer dispensing with our deference doctrine for administrative reasons because she is concerned about how our decision will affect the finality of past cases. The source of her concern is not entirely clear——this decision is incapable of reopening cases that have already been decided.[48] If they were final upon release of this opinion, their finality will go on undisturbed by our decision today. Relief from the judgment of a case is governed by Wis. Stat.

---

[47] Justice Gableman also says our deference doctrine has not delivered on promised gains in judicial efficiency. Id., ¶165. But the court has not been made aware of any study performing a differential analysis of litigative effort before and after Harnischfeger. So this, too, is a matter of speculation.

[48] Justice Ann Walsh Bradley shares Justice Ziegler's concern about the effect of our decision on the finality of previously decided cases. See Justice Ann Walsh Bradley's concurrence, ¶131.

64

§ 806.07.   Justice Ziegler thinks our rationale would allow a party to successfully reopen a case for several of the reasons mentioned in that statute, including "[m]istake" (para. (a)), or because "[t]he judgment is void" (para. (d)), or because "[a] prior judgment upon which the judgment is based has been reversed" (para. (f)), or for "[a]ny other reasons justifying relief from the operation of the judgment" (para. (h)).   Justice Ziegler's concurrence, ¶139 n.3.   She cites no authority for this proposition, nor could she.

¶90 Justice Ziegler's concern cannot be realized here for the same reason it has never been realized when we overrule one of our prior decisions.   That has never occurred because overruling a case does not expose to collateral attack any of the intervening decisions that were based on the overruled case. "To the contrary," Justice Ziegler says, "overruling one of our prior decisions[] can quite obviously have significant impact on other cases." Id.   But for over twenty years the impossibility of her concern has been black-letter law:   "The statute [§ 806.07] does not authorize relief from a judgment on the ground that the law applied by the court in making its adjudication has been subsequently overruled in an unrelated proceeding." Schauer v. DeNeveu Homeowner's Ass'n, Inc., 194 Wis. 2d 62, 75, 533 N.W.2d 470 (1995).[49]   True, as Justice Ziegler observed, Schauer specifically addressed the

---

[49] By "black-letter law," we mean that Schauer appears in the annotations for Wis. Stat. § 806.07.

65

circumstance in which "[a] prior judgment upon which the judgment is based has been reversed." See Wis. Stat. § 806.07(1)(f); Justice Ziegler's concurrence, ¶139 n.3. But that's why the case is so instructive. The whole point of Schauer's analysis was that when a court enters judgment in reliance on specific case precedent, the judgment's finality is entirely unaffected if the precedent is subsequently reversed. That's exactly the concern that Justice Ziegler expressed, and Schauer says "don't worry."

¶91 The other provisions of Wis. Stat. § 806.07 provide no cause for worry either. If a reversed precedent cannot stand in for a prior reversed judgment, there is no logical process——no matter how much it might resemble a Rube Goldberg machine——by which it could stand in for a "void judgment" under paragraph (d). And the catch-all "[a]ny other reasons justifying relief" is not worry-inducing because "[t]he general rule is that 'a change in the judicial view of an established rule of law is not an extraordinary circumstance which justifies relief from a final judgment under [Wis. Stat. § 806.07(1)(h)].'" Allstate Ins. Co. v. Brunswick Corp., 2007 WI App 221, ¶7, 305 Wis. 2d 400, 740 N.W.2d 888 (alteration in original) (quoted source omitted) (capitalization omitted); accord Schwochert v. Am. Family Mut. Ins. Co., 166 Wis. 2d 97, 103, 479 N.W.2d 190 (Ct. App. 1991), aff'd, 172 Wis. 2d 628, 494 N.W.2d 201 (1993) (same). Finally, the "[m]istake" provision of § 806.07(1)(a) can raise no alarm because it is never a mistake (within the meaning of this statute) for a court to rely on our

66

precedent.   Subsequently overruling the precedent cannot, to a metaphysical certainty, make an intervening court's reliance on the precedent a "mistake"——unless, that is, we are to presume the intervening court's ability to look forward in time to espy our change before we make it.

¶92  Justice Ziegler's concern is unknown to the law.  And she has identified no mechanism by which this unrealizable fear could possibly come to pass.

¶93  Justice Ann Walsh Bradley and Justice Ziegler are also concerned about whether our decision will adversely affect the precedential authority of cases decided pursuant to our now-discarded deference doctrine.  To the extent a court favored an agency's conclusion of law over its own, that conclusion is now part of the judgment of the case and an inextricable part of the opinion.  Consequently, its precedential and controlling effect will be the same as if the court had based the decision on its own interpretation.  The only future effect of our decision is that courts, rather than administrative agencies, will decide questions of law.  If that prospect is sufficient to raise an alarm against impending "tumult" (see Justice Ann Walsh Bradley's concurrence, ¶120), then we have more to worry about than a deference doctrine.

B.    "Processing" River Sediments

¶94    Now that we have identified the proper standard of review, we can address the petitioners' argument that they are not subject to the tax imposed by Wis. Stat. § 77.52(2).    This statute provides that:

> For the privilege of selling, performing or furnishing the services described under par. (a) at retail in this state to consumers or users, a tax is imposed upon all persons selling, performing or furnishing the services at the rate of 5% of the gross receipts from the sale, performance or furnishing of the services.

§ 77.52(2).    The services to which this provision refers include the following:

> The producing, fabricating, processing, printing or imprinting of tangible personal property for a consideration for consumers who furnish directly or indirectly the materials used in the producing, fabricating, processing, printing or imprinting.    This subdivision does not apply to the printing or imprinting of tangible personal property that results in printed material, catalogs, or envelopes that are exempt under s. 77.54(25) or (25m).

§ 77.52(2)(a)11.

¶95    The parties agree that, in this case, the petitioners are liable for the tax imposed by the Department only if Stuyvesant Dredging received compensation for "processing" tangible personal property it received (directly or indirectly) from the petitioners.    The parties also agree that the river sediment comprised tangible personal property, that Stuyvesant Dredging received compensation for the work it performed on the river sediment, and that the river sediment was furnished by the

petitioners.[50]   Therefore, the only question is whether Stuyvesant Dredging's work constituted "processing."

¶96  Because this case turns on the meaning of the term "processing" in Wis. Stat. § 77.52(2)(a)11., our task involves discerning the meaning of statutory text.   We discover a statute's meaning in its text, context, and structure. "[S]tatutory interpretation begins with the language of the statute," and we give that language its "common, ordinary, and accepted meaning."   State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶¶45-46, 271 Wis. 2d 633, 681 N.W.2d 110 (internal mark and quoted source omitted) ("Context is important to meaning.   So, too, is the structure of the statute in which the operative language appears.   Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; . . . .").   In performing this analysis, we carefully avoid ascribing an unreasonable meaning to the text.   See id., ¶46 ("[S]tatutory language is interpreted . . . reasonably, to avoid absurd or unreasonable results.").   If we determine the statute's plain meaning through this methodology, we go no further.   Id., ¶¶45-46 ("If the meaning of the statute is plain, we ordinarily stop the inquiry." (internal mark and quoted source omitted)).   See

---

[50] Tetra Tech engaged J.F. Brennan Co., Inc. to dredge the contaminated sediments and deliver them to Stuyvesant Dredging for separation.

generally Daniel R. Suhr, Interpreting Wisconsin Statutes, 100 Marq. L. Rev. 969 (2017).

¶97 Our statutes do not define the term "processing." Consequently, the Commission turned to a dictionary to assist its analysis, stating "[t]he dictionary definition of 'processing' is 'to put through the steps of a prescribed procedure; or, to prepare, treat, or convert by subjecting to a special process.'" The petitioners reject this definition, arguing that it is so broad it transforms a narrow and selective tax statute into a general tax on all services related to tangible personal property. They would instead have us find the term's meaning in the Administrative Code. Specifically, they propose Wis. Admin. Code § Tax 11.38(2) (June 1993), which provides:

> Fabricating and processing services, where materials are furnished directly or indirectly by the customer, that are subject to Wisconsin sales or use tax include, except as provided in sub. (1)(a) through (c):
>
> (a) Application of coating to pipe.
>
> (b) Assembling kits to produce a completed product.
>
> (c) Bending glass tubing into neon signs.
>
> (d) Bookbinding.
>
> (e) Caterer's preparation of food for consumption on or off the caterer's premises.
>
> (f) Cleaning used oil.
>
> (g) Cutting lumber to specifications and producing cabinets, counter tops or other items from lumber for customers, often called "millending."

70

(h) Cutting or crushing stones, gravel or other construction materials.

(i) Drying, planing or ripping lumber.

(j) Dyeing or fireproofing fabric.

(k) Fabricating steel which may involve cutting the steel to length and size, bending and drilling holes in the steel to specifications of a particular construction job.

(L) Firing of ceramics or china.

(m) Heat treating or plating.

(n) Laminating identification cards.

(o) Making a fur coat from pelts, gloves or a jacket from a hide.

(p) Making curtains, drapes, slip covers or other household furnishings.

(q) Production of a sound recording or motion picture.

(r) Retreading tires.

(s) Tailoring a suit.

(t) Threading pipe or welding pipe.

Wis. Admin. Code § Tax 11.38(2)(a)-(t).

¶98 Although we conclude that Stuyvesant Dredging "processed" the river sediment into its constituent parts, we do not believe either party provided a satisfactory definition of the term. The petitioners rely on Wis. Admin. Code § Tax 11.38(2) as an exhaustive recitation of "processing" services subject to Wisconsin's sales and use tax. Because the separation of river sediment does not appear in this list, they conclude that the principle expressio unius est exclusio alterius excludes Stuyvesant Dredging's services from the

71

statute's reach. This canon of statutory construction would be helpful if the list of services were meant to be exhaustive, rather than illustrative. But this is a tool of elucidation only——it has no power to contradict the code's text. And by its own terms, § Tax 11.38(2) contains an illustrative list, not a comprehensive one. The operative language says: "Fabricating and processing services, . . . that are subject to Wisconsin sales or use tax include, . . . ." Id. (emphasis added). The term "include" tells us that what follows is not exhaustive. See State v. James P., 2005 WI 80, ¶26, 281 Wis. 2d 685, 698 N.W.2d 95 ("[G]enerally, the word 'includes' is to be given an expansive meaning, indicating that which follows is but a part of the whole." (quoting Wis. Citizens Concerned for Cranes & Doves v. DNR, 2004 WI 40, ¶17 n.11, 270 Wis. 2d 318, 677 N.W.2d 612)). Further, even if it wished to, it is doubtful that the Department could restrict the scope of Wis. Stat. § 77.52(2) through the promulgation of § Tax 11.38(2). The petitioners identify no authority giving the Department power to either broaden or constrict the types of services subject to sales and use taxes. So it does not appear there is any way in which we could read § Tax 11.38(2) as a complete definition of "processing."

¶99 As an illustrative list, Wis. Admin. Code § Tax 11.38(2) is similarly unhelpful to the petitioners' cause. The petitioners say they purchased services that involved nothing more than "separating" tangible personal property into its components. But this could be said of cleaning used oil, too,

72

which presumably involves separating contaminants from the oil. See § Tax 11.38(2)(f). The petitioners also say that Stuyvesant Dredging's work cannot be understood as "processing" because it neither added nor subtracted anything from the personal property on which it performed its services. This could be said with equal accuracy of those who crush stones, and yet that service is part of the Department's illustrative list. See § Tax 11.38(2)(h). So § Tax 11.38(2) does not advance the petitioners' argument because it is not an exclusive list of "processing" activities, and because, as an illustrative list, it describes activity analogous to Stuyvesant Dredging's work.

¶100 But the petitioners have a legitimate concern about the breadth of the Commission's definition of "processing." That term stands cheek by jowl with "producing," "fabricating," "printing," and "imprinting" in Wis. Stat. § 77.52(2)(a)11. If "processing" really comprehends everything that puts tangible physical property "through the steps of a prescribed procedure," or applies a "special process" to "prepare, treat, or convert" it, then the term swallows all of its sentence-mates. For example, "producing" means "to make or manufacture (a product or commodity) from components or raw materials." Producing, The Oxford English Dictionary (2d ed. 1989) (definition 3.e.). Manufacturing something would certainly involve putting tangible property through the steps of a prescribed procedure. Similarly, "fabricating" means "[t]o make anything that requires skill; to construct, manufacture." Fabricating, The Oxford English Dictionary (2d ed. 1989) (definition 1.a.).

73

Fabricating, like producing, puts property through a prescribed procedure.  And "printing" means "[t]o make or produce (text, a book, a picture, etc.) by a mechanical process involving the transfer of characters or designs on to paper, vellum, etc." Printing, The Oxford English Dictionary (2d ed. 1989) (definition II.8.a.).  And finally, "imprinting" means "[t]o mark by pressure; to impress, stamp," "[t]o impress (letters or characters) on paper or the like by means of type," and "[t]o make an impression or impressed figure upon; to stamp or impress (something) with a figure, etc."  Imprinting, The Oxford English Dictionary (2d ed. 1989) (definitions 1.a., 2., and 4.a., respectively).  Each of these companion terms could fairly be understood as specific examples of the Commission's definition of "processing."  But ascribing such a broad meaning to that word would make surplusage of all the companion terms.  Whenever possible, we avoid reading statutory language in a fashion that leaves some of it with no work to do.  Kalal, 271 Wis. 2d 633, ¶46 ("Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage.").

¶101 Therefore, we must understand "processing" to bear a meaning that does not displace all of the other descriptors in Wis. Stat. § 77.52(2)(a)11.  We begin with the purpose of subdivision 11., which is to identify categories of services performed on tangible personal property that are subject to Wisconsin's sales and use tax.  As we pursue the proper meaning of "processing," its companion terms provide invaluable

assistance.   The noscitur a sociis canon of construction (literally, "it is known from its associates") instructs that "[w]hen two or more words or phrases are listed together, the general terms . . . may be defined by the other words and understood in the same general sense." Schill v. Wis. Rapids Sch. Dist., 2010 WI 86, ¶66, 327 Wis. 2d 572, 786 N.W.2d 177; accord State v. Quintana, 2008 WI 33, ¶35, 308 Wis. 2d 615, 748 N.W.2d 447 ("[A]n unclear statutory term should be understood in the same sense as the words immediately surrounding or coupled with it." (quoted source omitted)).  Because the structure of the text indicates that the terms are of equal dignity, we will not read any one of them to swallow the others.  Although the types of services may share some (and even many) common characteristics, each will retain an independent meaning so long as it has at least one attribute distinct from the others.  With these principles in mind, we can discern a meaning for "processing" that is informed by, and consistent with, its associates.

¶102 Based on the definitions above, we see that "fabricating" is distinct from its associates in that it requires skill in the construction or manufacture of a final product.  "Producing" contemplates the creation of a final product from the combination of components or raw materials, a characteristic that is not necessarily encompassed by "fabricating," which could describe the manufacture of a product out of a single resource.  "Printing" differs from the other categories in that it involves "the transfer of characters or

75

designs" onto a medium. And finally, "imprinting" is unique even from "printing" in that characters or designs are impressed on a medium through pressure (as, for example, metal stamping in which the medium is deformed to depict the character or design).[51]

---

[51] Justice Ziegler's concurrence, to the extent it addresses whether "processing" encompasses the activity at issue here, is based in large part on a mistaken impression that the legislature defined "printing" and "imprinting." It did not. She refers to Wis. Stat. § 77.51(11), which says (in full): "'Printing' and 'imprinting' include lithography, photolithography, rotogravure, gravure, letterpress, silk screen printing, multilithing, multigraphing, mimeographing, photostating, steel die engraving and similar processes." This is not a definition. It is an incomplete list of examples. It is not a definition for the same reason we do not consider Wis. Admin. Code § Tax 11.38(2) a definition of "processing," which similarly contains an incomplete list of examples.

Nonetheless, Justice Ziegler finds significance in the title of section 77.51, "Definitions." But this means, quite literally, nothing: "The titles to subchapters, sections, subsections, paragraphs and subdivisions of the statutes and history notes are not part of the statutes." Wis. Stat. § 990.001(6).

And the fact that the legislature did not feel the need to say which category encompasses which activities does not mean printing and imprinting are the same thing (as Justice Ziegler suggests). See Justice Ziegler's, concurrence, ¶143. It means the legislature did not care to separate them into their proper categories, a fact from which no useful information can be drawn. It is theoretically possible to use this illustrative list to develop a definition of "printing" or "imprinting." But that would involve first defining each of the listed activities, and then extrapolating the constituent elements into a definition for the two terms. Even at that, the result would be uncertain because there is no way to identify the category to which each listed activity belongs. Consequently, recourse to Wis. Stat. § 77.51(11) simply isn't helpful in discovering a definition for "printing" or "imprinting."

¶103 Turning now to the proper meaning of "processing," we know it must contain at least one attribute that is distinct from those described above if it is not to displace its neighbors. The Oxford English Dictionary says "processing" means, in pertinent part, "[t]o subject to or treat by a special process; to operate on mechanically or chemically." Processing, The Oxford English Dictionary (2d ed. 1989) (definition 3.a.). It is poor form to use the defined word in its own definition, mostly because such a construct provides little to no information. Here, this infraction means the first clause tells us nothing but that processing is "special," which is entirely unhelpful. The second clause, however, is instructive. Applying that material to the term "processing" as it appears in Wis. Stat. § 77.52(2)(a)11. yields a meaning with a characteristic distinct from its companions. We conclude that "processing" encompasses the performance of a mechanical or chemical operation on tangible personal property, a task that can be completed without transforming the property into a new product, or adding anything to it that was not already there.[52] "Fabricating" and "producing" both necessarily contemplate the creation of a new product, which makes them distinct from

---

[52] Our opinion should not be interpreted as an attempt to comprehensively define "processing," "fabricating," "producing," "printing," or "imprinting." With respect to "processing," we conclude the term is at least as broad as we have described. Whether it is more extensive than this is a question we need not answer to resolve this case.

"processing." And both "printing" and "imprinting" require the addition of something to the property that was not there before, which is not a requirement of "processing." Therefore, because we are able to identify a characteristic of "processing" that is distinct from its companions, we have confirmed that it is capable of carrying a meaning that cannot subsume or be subsumed by the others.[53]

¶104 Understood in this fashion, "processing" encompasses Stuyvesant Dredging's separation of river sediment into its component parts. The Commission's Ruling and Order described how this was accomplished. After going through scalping screens, slurry holding tanks, and slurry thickener tanks, the

---

[53] Justice Ziegler would adopt a definition of "processing" without reference to the other terms in the statute, and apparently without much concern for whether this creates surplusage or results in an extraordinarily broad definition. See Justice Ziegler's concurrence, ¶¶146-53. This loose approach to statutory construction might be acceptable in other contexts, but it is entirely inappropriate when addressing a tax statute, especially this one. Section 77.52 of our statutes covers the sale of both goods and services. See Wis. Stat. § 77.52(1) (goods), (2) (services). With respect to the former, the statute is all-encompassing; in contrast, this statute taxes services only if they are listed. Compare § 77.52(1), with § 77.52(2)(a) ("The tax imposed herein applies to the following types of services: . . . ."). We must make our best effort at determining the specific meaning of the listed types of service because, as we have said before, "a tax cannot be imposed without clear and express language for that purpose, . . . ." DOR v. Milwaukee Ref. Corp., 80 Wis. 2d 44, 48, 257 N.W.2d 855 (1977). Justice Ziegler dispenses with those restrictions and safeguards by accepting any definition that might encompass Tetra Tech's activities. Perhaps the legislature will one day adopt that approach, but this is not that day.

78

sediment enters the coarse and fine sand separation operations. The coarse separation operation physically separates, washes, and dewaters sand particles larger than 150 microns from the sludge. The fine sand separation operation does the same for sand particles between 63 and 150 microns. The petitioners confirm that everything Stuyvesant Dredging receives from them is returned. The only difference is that the property is separated into its components. No new product has been created; no chemical transformation has occurred; and the property is still just as contaminated as when Stuyvesant Dredging received it. The work described by the Commission reflects the performance of a mechanical operation on the river sediments. Therefore, petitioners are subject to the sales and use tax of Wis. Stat. § 77.52(2) because Stuyvesant Dredging received compensation for "processing" river sediment received from the petitioners.

¶105 It is unlikely that our definition of "processing" will upset the petitioners' reasonable expectations. The Commission said that Tetra Tech's vice-president of project engineering testified that Stuyvesant Dredging "processed" the river sediment. Similarly, an operations manager who oversaw LFR Remediation's work on the Fox River testified that Stuyvesant Dredging "processed" the river sediment. And the Commission observed that, "[a]t various points in the affidavits and depositions of Petitioner's general manager and experts, they refer to what SDI [Stuyvesant Dredging] does as a 'process' or as 'processing.' That language is also used in many of the

contracts between Tetra Tech and SDI." Although we do not derive the meaning of a statutory term from a party's subjective understanding, we recount this history as confirmation that our analysis has not ventured outside the realm of what those subject to the statute might reasonably anticipate.

¶106 As is apparent from this analysis, we gave little weight to the Commission's understanding of the term "processing." We recognize the legislature charged the Commission with the duty to decide contested cases involving the application of Wis. Stat. § 77.52(2). However, there is no indication the Commission has a long-standing interpretation of what "processing" means for purposes of § 77.52(2)(a)11. Nor does the record intimate that it used any particular experience, technical competence, or specialized knowledge to develop an understanding of that term——it relied on a dictionary. It necessarily follows that the Commission did not bring a unique perspective or significance to the meaning of "processing." Consequently, the "due weight" calculus of Wis. Stat. § 227.57(10) did not increase the persuasiveness of the Commission's conclusion of law.

### III. Conclusion

¶107 The petitioners paid Stuyvesant Dredging to process river sediment within the meaning of Wis. Stat. § 77.52(2)(a)11., so they are liable for the sales and use tax imposed by § 77.52(2). Therefore, we affirm the court of appeals.

¶108 We have also decided to end our practice of deferring to administrative agencies' conclusions of law. However, pursuant to Wis. Stat. § 227.57(10), we will give "due weight" to the experience, technical competence, and specialized knowledge of an administrative agency as we consider its arguments.

*By the Court.*—The decision of the court of appeals is affirmed.

¶109 ANN WALSH BRADLEY, J.    *(concurring).*    I concur in the mandate of the court because I agree that the term "processing" as used in Wis. Stat. § 77.52(2)(a)11. encompasses the separation of river sediment into its component parts.    See majority/lead op., ¶3.[1]    Such a result is compelled whether we

---

[1] I refer to Justice Kelly's opinion as a "majority/lead" opinion to assist litigants and courts in understanding its precedential value.    Justice Kelly's opinion is a majority opinion with regard to the statutory analysis of the term "processing" presented in Section II.B of the majority/lead opinion and the conclusions presented in Section III.    See State v. Elam, 195 Wis. 2d 683, 685, 538 N.W.2d 249 (1995) (explaining that "a majority of the participating judges must have agreed on a particular point for it to be considered the opinion of the court.").    As set forth in footnote 4 of the majority/lead opinion, it also constitutes a majority in:

- Section I, setting forth the facts (which are not in issue),

- Section II.A.1., providing a review of the current standard for review of agency decisions (which is not subject to reasonable dispute), and

- Section II.A.2., going through the history of the deference doctrine (which is, again, not in issue).

In contrast, "a lead opinion is one that states (and agrees with) the mandate of a majority of the justices, but represents the reasoning of less than a majority of the participating justices."    State v. Lynch, 2016 WI 66, ¶143, 371 Wis. 2d 1, 885 N.W.2d 89 (Abrahamson & Ann Walsh Bradley, J.J., concurring in part, dissenting in part) (citing Hoffer Props., LLC v. State, Dep't of Transp., 2016 WI 5, 366 Wis. 2d 372, 874 N.W.2d 553); In re Disciplinary Proceedings Against Riley, 2016 WI 70, ¶¶92-95, 371 Wis. 2d 311, 882 N.W.2d 820 (Abrahamson, J., concurring).

(continued)

1

give the agency's interpretation great weight, due weight, or no weight at all.

¶110 Further, I agree with the concurrences of Justices Ziegler and Gableman that, consistent with our doctrine of constitutional avoidance, the court need not reach the issue of whether our deference framework violates the Wisconsin Constitution.

¶111 I write separately, however, for two reasons. First, the majority/lead opinion ignores controlling precedent to reach a result that upends decades of administrative law jurisprudence. Similarly, the concurrences of Justices Ziegler and Gableman, while not reaching the constitutional issue, would toss away a framework that has served courts well for decades. Second, the court's misguided wholesale changes create possible unintended consequences and a great deal of uncertainty.

¶112 The court should not so cavalierly discard our past practice. Additionally, its apparent lack of concern for what will become of the jurisprudence that has arisen through deference gives rise to more questions than it answers. Are cases in which courts afforded deference to an agency interpretation still good law? Or do some of these issues need to be relitigated under the new standard of review the court

---

A majority of justices do not embrace the reasoning or constitutional analysis set forth in Sections II.A.3 through II.A.6 of the majority/lead opinion. See majority/lead op., ¶3 n.4. The reasoning the majority/lead opinion presents for dispatching with our deference doctrine represents the reasoning of Justices Rebecca Grassl Bradley and Daniel Kelly only.

announces today?  The majority/lead opinion's assurances are of little comfort.  <u>See</u> Justice Ziegler's concurrence, ¶139 n.3.

¶113 Because I would not jettison a past practice that has served us well, I respectfully concur.

I

¶114 At the outset, I observe that the impetus for dismantling years of administrative law jurisprudence did not come from any party, but from this court.  The issue of whether our agency deference doctrine violates the Wisconsin Constitution was not raised by any party to this case before the circuit court, court of appeals, or in the petition for review here.  It was this court, sua sponte, that asked that the issue be addressed in the first instance.

¶115 Having raised the issue, the majority/lead opinion fails to follow established precedent when addressing it.  Had the majority/lead opinion adhered to our precedent, it would not have arrived at a result that creates such uncertainty.  To the contrary, it would have reached the conclusion that our deference doctrine comports with the Wisconsin Constitution.  By concluding that our deference doctrine removes the interpretive role of the judiciary, the majority/lead opinion commits legal error.

¶116 Indeed, this court previously examined a very similar question.  In <u>Borgnis v. Falk Co.</u>, 147 Wis. 327, 358, 133 N.W. 209 (1911), the court addressed an argument that the workers' compensation law "is unconstitutional because it vests judicial power in a body which is not a court and is not

3

composed of men elected by the people, in violation of those clauses of the state Constitution which vest the judicial power in certain courts and provide for the election of judges by the people . . . ."

¶117 Rejecting the argument, the Borgnis court stated that the commission is "an administrative body or arm of the government which in the course of its administration of a law is empowered to ascertain some questions of fact and apply the existing law thereto, and in so doing acts quasi-judicially, but it is not thereby vested with judicial power in the constitutional sense." Id. (second emphasis added). The court added:

> While acting within the scope of its duty, or its jurisdiction, as it is sometimes called, such a board may lawfully be endowed with very broad powers, and its conclusions may be given great dignity and force, so that courts may not reverse them unless the proof be clear and satisfactory that they are wrong.

Id. at 359.

¶118 Borgnis is on point here. In response to the argument made over a century ago, the Borgnis court suggested that only clear violations of law, i.e. unreasonable interpretations, are outside the jurisdiction of an agency. This is the same foundation underlying our deference framework. Although Borgnis addressed certiorari review, the same principle would apply to review of any administrative decision.

¶119 Further, contrary to the majority/lead opinion's assertion, agency deference does not remove from the court its interpretive role and cede it to the agency. In its

4

application, deference does not mean accepting an agency's interpretation without a critical eye. Racine Harley-Davidson, Inc. v. State, Div. of Hearings and Appeals, 2006 WI 86, ¶15, 292 Wis. 2d 549, 717 N.W.2d 184. Rather, "[t]he court itself must always interpret the statute to determine the reasonableness of the agency interpretation." Id. Only reasonable interpretations are worthy of deference. Id.

¶120 Not only does the majority/lead opinion throw tumult into a previously well-settled area of the law, but it does so based on a legal error. I would not upset the finality and consistency of our past decisions.

II

¶121 I write next to call attention to the unknown consequences of the court's decision. The court's result represents a tectonic shift in the administrative law landscape. See Operton v. LIRC, 2017 WI 46, ¶71, 375 Wis. 2d 1, 894 N.W.2d 426 (Ziegler, J., concurring) ("There is little doubt that ending the court's practice of according deference to agency interpretations of statutes would constitute a sea change in Wisconsin law[.]"). But on the topic of what this vast and sweeping change means for our prior cases, the majority/lead opinion provides precious little guidance.

¶122 Compounding its error, the majority/lead opinion unwinds our three-tiered system of deference by declaring it unconstitutional where, as Justices Ziegler and Gableman aptly observe, the use of the court's administrative powers would suffice. In doing so, the majority/lead opinion ignores our

5

usual practice of constitutional avoidance. See State v. Hale, 2005 WI 7, ¶42, 277 Wis. 2d 593, 691 N.W.2d 637 ("Normally this court will not address a constitutional issue if the case can be disposed of on other grounds."). Again, the majority/lead opinion is silent as to the ramifications of constitutionalizing the question. However, even making a decision on administrative grounds, we must consider the ramifications of such a decision.

¶123 The principle of stare decisis militates against the court's conclusion. Stare decisis is based in part on "the desirability that the law furnish a clear guide for conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise[.]" Johnson Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶95, 264 Wis. 2d 60, 665 N.W.2d 257 (quoting Moragne v. States Marine Lines, Inc., 398 U.S. 375, 403 (1970)). Parties appearing before agencies and those appealing agency decisions now enter uncharted waters. With no guide, they could be subject to conflicting statutory interpretations that will make it nearly impossible to plan their affairs with any certainty.

¶124 This court, the court of appeals, and circuit courts throughout the state have applied great weight deference and due weight deference going back decades. What is the precedential value of these cases now? Are the principles they divine still good law even though they were reached through the application of a deference doctrine the court eschews today?

¶125 As an example, let's examine a case involving a question of statutory interpretation similar to that at issue

6

here. In <u>Zip Sort, Inc. v. Wis. DOR</u>, 2001 WI App 185, ¶1, 247 Wis. 2d 295, 634 N.W.2d 99, the court of appeals addressed an agency interpretation of the term "manufacturing property" as used in Wis. Stat. § 70.995.[2]

─────────────────

[2] Wis. Stat. § 70.995 (1993-94) provides in relevant part:

> (1) APPLICABILITY. (a) In this section "manufacturing property" includes all lands, buildings, structures and other real property used in manufacturing, assembling, processing, fabricating, making or milling tangible personal property for profit . . .
>
> . . .
>
> > (d) Except for the activities under sub. (2), activities not classified as manufacturing in the standard industrial classification manual, 1987 edition, published by the U.S. office of management and budget are not manufacturing for this section.
>
> (2) FURTHER CLASSIFICATION. In addition to the criteria set forth in sub. (1), property shall be deemed prima facie manufacturing property and eligible for assessment under this section if it is included in one of the following major group classifications set forth in the standard industrial classification manual, 1987 edition, published by the U.S. office of management and budget. . . . :
>
> . . .
>
> > j) 27—Printing, publishing and allied industries.
>
> . . .
>
> > (v) 39—Miscellaneous manufacturing industries.

7

¶126 The question presented was whether Zip Sort's activities entitled it to a "manufacturing property" designation for tax purposes. Zip Sort's primary business was to make mail machine-sortable through the addition of a bar code. Id., ¶3.

¶127 The Department of Revenue determined that such activity did not entitle Zip Sort to a manufacturing classification for its property, and the Tax Appeals Commission agreed. Id., ¶10. In examining this determination, the court of appeals initially set about to determine the proper level of deference to accord to the Department's interpretation of the term "manufacturing property." Id., ¶¶11-22. The court declined to "determine whether the proper standard of review is due weight deference or great weight deference because [it] conclude[d] that the commission's conclusions under § 70.995 at least met the due weight deference standard." Id., ¶22.

¶128 Pursuant to such a standard, the court of appeals determined that the commission's interpretation was reasonable, and that Zip Sort's interpretation was "no more reasonable." Id., ¶34. Accordingly, it affirmed the commission's decision. Id. Whether the commission's interpretation was correct did not enter the analysis.

¶129 If it applied a de novo standard of review, would the Zip Sort court reach the same result? I do not know. However, the Zip Sort decision was reached through the methodology that a majority of this court now disowns (and that several members suggest is contrary to the Wisconsin Constitution). Is what was a settled point of law since 2001 now unsettled? Can businesses

8

and agencies rely on our past decisions in planning their future activities? The majority/lead opinion's assurances that they can provide little comfort and are thinly supported. See Justice Ziegler's concurrence, ¶139 n.3.

¶130 Zip Sort is not the only case where an appellate court has applied our three-tiered deference methodology. It serves as but one example of the myriad cases where courts have faithfully applied the deference jurisprudence as set forth by this court.

¶131 The court has significantly upset the finality of our past cases. "[F]requent and careless departure from prior case precedent undermines confidence in the reliability of court decisions." Johnson Controls, 264 Wis. 2d 60, ¶95. "When legal standards 'are open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results.'" State v. City of Oak Creek, 2000 WI 9, ¶55 n.27, 232 Wis. 2d 612, 605 N.W.2d 526 (citations omitted).

¶132 Our three-tiered deference scheme has suited us well over the past decades. In unnecessarily disowning our well-developed jurisprudence, the court should at least provide guidance for the future. Litigants, circuit courts and the court of appeals should not be left adrift to redefine what has previously been well-settled.

¶133 For the above stated reasons, I respectfully concur.

¶134 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this concurrence.

9

¶135 ANNETTE KINGSLAND ZIEGLER, J. *(concurring)*. I agree with the result the court reaches. I concur and write separately because the analysis that the lead opinion employs to reach its conclusions is concerning. First, in my view, it is both unnecessary and inadvisable to rely on constitutional grounds for ending our practice of deferring to administrative agencies' conclusions of law. Deference to administrative agencies was a court-created doctrine and, thus, is one that can be court eliminated. We need not reach for the constitution to so act.

¶136 Second, in interpreting the statute here, the court[1] relies on ordinary meaning to define all of five terms, even though two of them have statutory definitions. Additionally, the court relies on the surplusage canon as grounds for selectively defining necessarily broad terms, even though the complete overlap between the two statutorily-defined terms indicates that the legislature may well have intended for overlap among the undefined terms as well.

¶137 Nevertheless, I agree that "'processing' encompasses Stuyvesant Dredging's separation of river sediment into its component parts." Majority op., ¶104. Accordingly, I respectfully concur.

---

[1] We refer to the opinion as a lead opinion in Part I because its constitutional analysis has not garnered the support of a majority of the court. We refer to the opinion as that of "the court" or as the "majority opinion" in Part II because its statutory analysis does have the support of a majority of the court.

1

I.  INTERPRETING AND APPLYING THE LAW

¶138 The lead opinion reaches for the constitution unnecessarily.  It states as follows:

> As the deference doctrine developed . . . [we did not] determine whether this was consistent with the allocation of governmental power amongst the three branches.  So, as a matter of first impression, we consider whether our deference doctrine is compatible with our constitution's grant of power to the judiciary . . . .

Lead op., ¶42.  As the lead opinion acknowledges, our deference doctrine was a policy of judicial administration,[2] and, as such, it is not essential to draw on constitutional principles to overturn it.  See State v. Castillo, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) ("An appellate court should decide cases on the narrowest possible grounds."); Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶¶51-53, 376 Wis. 2d 147, 897 N.W.2d 384 ("This court does not normally decide constitutional questions if the case can be resolved on other grounds.").  I depart with the lead opinion because the doctrine of constitutional avoidance requires that we act with restraint.  In accordance with this principle, I would not rely on the constitution to overturn our judicially-created administrative deference doctrine.

---

[2] See, e.g., lead op., ¶34 ("[Great weight deference] developed as a home-grown doctrine within the judiciary . . . ."); id., ¶70 ("[G]reat weight deference is a creature of our own making . . . ."); id., ¶40 ("[J]ust like 'great weight' deference, 'due weight' deference has become an integral, and therefore unavoidable, part of the framework within which we review an administrative agency's conclusions of law."); id., ¶3 ("We have [] decided to end our practice of deferring to administrative agencies' conclusions of law.").

¶139 Moreover, departing from deference on the basis of judicial administration would not call into question the continuing validity of the decades of cases that have relied on the deference doctrine. In this regard, I disagree with the lead opinion's assertions that "[i]f [a decision] [was] final upon release of this opinion, [its] finality will go on undisturbed by our decision today";[3] and that "[c]onsequently

---

[3] The lead opinion cites Wis. Stat. § 806.07 in support of this assertion, concluding that no paragraph of that statute would allow a party to reopen a final judgment based on this decision. Lead op., ¶¶89-91. To the contrary, the lead opinion's conclusion that deference is unconstitutional could support an argument for relief from a final judgment under § 806.07(1)(a), on the basis of "mistake"; under para. (1)(d), on the basis that "[t]he judgment is void"; under para. (1)(f), on the basis that "[a] prior judgment upon which the judgment is based has been reversed"; or under para. (1)(h), on the basis that "[a]ny other reasons justifying relief from the operation of the judgment." § 806.07(1)(a), (d), (f), (h).

The lead opinion attempts to bolster its interpretation of § 806.07 by quoting Schauer v. DeNeveu Homeowners Ass'n, Inc., 194 Wis. 2d 62, 75, 533 N.W.2d 470 (1995), for the proposition that "'[§ 806.07] does not authorize relief from a judgment on the ground that the law applied by the court in making its adjudication has been subsequently overruled in an unrelated proceeding.'" Lead op., ¶90 (alteration in original). To the contrary, the court in Schauer concluded that "sec. 806.07(1)(f) does not authorize relief from a judgment on the ground that the law applied by the court in making its adjudication has been subsequently overruled in an unrelated proceeding." Schauer, 194 Wis. 2d at 66. Thus, the lead opinion's implication-by-alteration that this case interpreted § 806.07 broadly is error. Moreover, Schauer was a case where the parties had reached a settlement regarding the scope of an easement wherein they allegedly relied on later-overruled case law in reaching the settlement. Thus, while arguably Schauer decided the application of § 806.07(1)(f) under those circumstances, it does not address other subsections of the statute, nor does it address every possible application of § 806.07(1)(f).

(continued)

3

[the] precedential and controlling effect [of past cases] will be the same as if the court had based the decision on its own interpretation." Lead op., ¶¶89, 93. The lead opinion provides no support for these assertions and the constitutional tenor of its analysis suggests exactly the opposite. Accordingly, I agree with Justice Ann Walsh Bradley's concurrence that the lead opinion fails to adequately account for the effect its analysis will have on prior decisions.

¶140 Additionally, it is inadvisable to turn to the constitution and address the "core powers" of the judiciary in this case. The lead opinion's "core powers" analysis proceeds as follows: judicial power is vested in the judiciary;[4] the doctrine of separation of powers is fundamental to government;[5] the powers of each branch of government fall into one of two categories——shared powers or exclusive/core powers;[6] the judiciary has the "'exclusive responsibility to exercise judgment in cases and controversies arising under the law'";[7]

---

Additionally, the lead opinion's assertion that "overruling a case does not expose to collateral attack any of the intervening decisions that were based on the overruled case" is subject to question. Lead op., ¶90. To the contrary, overruling one of our prior decisions, can quite obviously have significant impact on other cases.

[4] See lead op., ¶42 (citing Wis. Const. art. VII, § 2).

[5] See lead op., ¶44 (citing Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶11, 376 Wis. 2d 147, 897 N.W.2d 384).

[6] See lead op., ¶46 (citing State v. Horn, 226 Wis. 2d 637, 643, 594 N.W.2d 772 (1999)).

[7] Lead op., ¶54 (quoting Gabler, 376 Wis. 2d 147, ¶37).

4

exercising judgment "encompasses interpreting and applying the law to the case . . . ";[8] therefore, "only the judiciary may authoritatively interpret and apply the law in cases before our courts."[9]  In other words, the judiciary has constitutionally-conveyed jurisdiction to interpret and apply the law in cases and controversies before the courts.

¶141 This conclusion is either quite remarkable or quite unremarkable; that is, if the lead opinion is breaking new ground in defining the power of the judiciary, that is remarkable, but if it is not, there is no need to remark on the court's role here because it is not disputed.  Given that the lead opinion feels the need to so-remark, however, I feel compelled to caution that its comments should not be read more broadly for the proposition that the judiciary possesses exclusive authority to interpret and apply the law generally in all arenas.  Although the lead opinion appears to agree that the power to interpret and apply the law more generally is shared among the branches,[10] its definition of the judiciary's "core

---

[8] Lead op., ¶54.

[9] Id.

[10] For example, the lead opinion states as follows:

The executive must certainly interpret and apply the law; it would be impossible to perform his duties if he did not.  After all, he must determine for himself what the law requires (interpretation) so that he may carry it into effect (application).  Our constitution not only does not forbid this, it requires it.  Wis. Const. art. V, § 1 ("The executive power shall be vested in a governor . . . ."); Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1217 (2015) (Thomas,

(continued)

5

power," see supra ¶140, is applied more broadly at times such that it could be read to abrogate the shared nature of the power to interpret and apply the law.[11] This lead opinion is not to be read so broadly.

¶142 In sum, I would not reach the constitutional issue because reversal on judicial administration grounds is more appropriate: that which the court administratively gives, the court can administratively take away, and doing so on the basis of judicial administration would not require undermining the decades of cases that did rely on the deference doctrine because, at the time, it was our policy to do so. Additionally, the lead opinion's conclusions on constitutional grounds——regarding the judiciary's core powers——should be read as limited to the unremarkable reiteration of our responsibility to interpret and apply the law in cases and controversies before the courts.

---

J., concurring) ("It is undoubtedly true that the other branches of Government have the authority and obligation to interpret the law . . . .").

Lead op., ¶53.

[11] See, e.g., lead op., ¶54 (citing Operton v. LIRC, 2017 WI 46, ¶73, 375 Wis. 2d 1, 894 N.W.2d 426 (R. Grassl Bradley, J., concurring)) ("'[T]he court's duty to say what the law is' constitutes a 'core judicial function.'"); id., ¶70 (citing Wis. Stat. § 227.57(5)) ("[T]he statute says the court is to decide whether the agency has 'erroneously interpreted a provision of law.' And the court is to determine the 'correct interpretation of the provision of law.' This formulation recognizes the proper residence of our core judicial powers."); id., ¶¶73-74 (implying that an agency's interpretation and application of the law is an exercise of "our power.").

6

II. INTERPRETING AND APPLYING WIS. STAT. § 77.52(2)(a)11.

¶143 I also write because I do not agree with the court's redefining terms that the legislature has statutorily defined. Specifically, the legislature defines "printing" and "imprinting." See Wis. Stat. § 77.51(11). Without acknowledging or attempting to incorporate these two statutorily-defined terms into its analysis, the court first turns to ordinary meaning (i.e., dictionaries) in interpreting and applying Wis. Stat. § 77.52(2)(a)11. While it is not improper for the court to turn to the dictionary for the undefined terms, I take issue with the court turning to the dictionary to redefine "printing" and "imprinting"——the two statutory terms. In so doing, the court also overstates the necessity of avoiding surplusage because the legislature here has defined at least some terms——printing and imprinting——to entirely overlap. In the end, this is a taxation statute; it could very well be that the legislature wanted to leave little room for exclusion from taxation.

A. Specially-Defined Terms: Printing and Imprinting

¶144 The legislature provided definitions for two of the five terms at issue——printing and imprinting——and those two

7

statutorily-defined terms completely overlap.[12]  However, in an effort to ensure that each term "retain[s] an independent meaning," that is, "has at least one attribute distinct from the others," majority op., ¶101, the court makes no mention of the legislatively-provided definitions, but instead selects dictionary definitions that support its analysis.  Majority op., ¶100.  I find that to be contrary to our prescribed method of statutory interpretation.

¶145 To start, Wis. Stat. § 990.01(1) provides:  "All words and phrases shall be construed according to common and approved usage; but technical words and phrases and others that have a peculiar meaning in the law shall be construed according to such meaning."  Similarly, State ex rel. Kalal v. Circuit Court for Dane County states:  "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning."  2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110; see also Antonin Scalia & Bryan A.

---

[12] The five terms at issue are "processing," "producing," "fabricating," "printing," and "imprinting."  "Printing" and "imprinting" are defined by statute, see Wis. Stat. § 77.51(11); "processing," "producing," and "fabricating" are not.  The court argues that § 77.51(11), despite being a subsection of the "Definitions" section of the statute, does not provide a definition because it provides no "useful information." Majority op., ¶102 n.51.  As noted below, see infra ¶145, note 14, the fact that the court finds the statutory definition unhelpful in conducting its preferred analysis is not a reason to ignore it.  Moreover, to the contrary, § 77.51(11) does provide useful information, namely, a measure of the legislature's comfort with overlap.  See infra ¶149.

Garner, Reading Law: The Interpretation of Legal Texts 69-77 (2012) ("Ordinary-Meaning Canon") ("Words are to be understood in their ordinary, everyday meanings——unless the context indicates that they bear a technical sense.").

¶146 Under the statute, "printing" and "imprinting" are specially defined: "'Printing' and 'imprinting' include lithography, photo-lithography, rotogravure, gravure, letterpress, silk screen printing, multilithing, multigraphing, mimeographing, photostating, steel die engraving and similar processes." Wis. Stat. 77.51(11) (2007-08).[13] Nevertheless, the court states as follows:

> "[P]rinting" means "[t]o make or produce (text, a book, a picture, etc.) by a mechanical process involving the transfer of characters or designs on to paper, vellum, etc." Printing, The Oxford English Dictionary (2d ed. 1989) (definition II.8.a.). . . . "[I]mprinting" means "[t]o mark by pressure; to impress, stamp," "[t]o impress (letters or characters) on paper or the like by means of type," and "[t]o make an impression or impressed figure upon; to stamp or impress (something) with a figure, etc." Imprinting, The Oxford English Dictionary (2d ed. 1989) (definitions 1.a., 2., and 4.a., respectively).

Majority op., ¶100. This reliance on ordinary meaning (i.e., dictionaries) is contrary to statute and to the common law because "printing" and "imprinting" are specially defined. See Wis. Stat. § 990.01(1); Kalal, 271 Wis. 2d 633, ¶45. But, despite the clarity of the law in this area, the court gives no consideration to the synonymous, statutory definition and

---

[13] "Printing" and "imprinting" are also specially defined in this manner in the 2005-06 version of the statute. See majority op., ¶2 n.2.

9

instead favors dual dictionary definitions. Doing so does aid its analysis in at least two ways,[14] but the legislatively defined terms cannot be ignored for the sake of convenience. Moreover, further analysis reveals that relying on the synonymous statutory definitions is not fatal to the court's result because such overlap is likely what the legislature intended.

## B. Surplusage

¶147 The court understandably struggles with distinguishing "processing," "producing," and "fabricating." As an initial matter, these terms are not statutorily defined. And, although normally this would not present great difficulty——as resort to dictionaries for ordinary meaning is appropriate where terms are not statutorily defined——here, even the dictionary definitions have significant overlap. (How would one produce or fabricate something without putting it through a process?) But instead of acknowledging this overlap, the court reaches to distinguish these terms in order to avoid surplusage. Such artifice is unnecessary in my view. First, surplusage need not be avoided

---

[14] First, the statutory definition is illustrative rather than descriptive. Thus, reliance on the statutory definition would impair the court's analysis because it would not provide a useful comparison to the court's descriptive dictionary definitions of "producing" and "fabricating." See majority op., ¶100. Second, the statute defines "printing" and "imprinting" as synonyms, that is, their statutory definition overlaps in its entirety. Thus, reliance on the statutory definition would impair the court's analysis because it would contravene the court's conclusion that each term "retain[s] an independent meaning" because "it has at least one attribute distinct from the others." Majority op., ¶101.

at all costs. Second, not all overlap is surplusage, particularly where, as here, the plain meaning of the terms and the synonymous nature of coordinate, legislatively-defined terms invites overlapping interpretations. Third, regardless of the amount of overlap, Stuyvesant Dredging's actions fall within the definition of "processing." Again, in a taxation statute, where generally the legislature is trying to include, not exclude, those who will be subject to taxation, such a broad sweep is unsurprising.

¶148 While avoiding surplusage is generally favored, surplusage need not be avoided at all costs. Kalal states: "Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage." 271 Wis. 2d 633, ¶46 (emphasis added); see also Scalia & Garner, supra ¶144 at 174-79 ("Surplusage Canon") ("If possible, every word and every provision is to be given effect . . . .") (emphasis added). Thus, it is not true that "we must understand 'processing' to bear a meaning that does not displace all of the other descriptors . . . ." Majority op., ¶101 (emphasis added).[15]

¶149 Additionally, in my view, it may not be possible to avoid complete overlap among "processing," "producing," and

---

[15] In this regard, I do not disagree that "[w]e must make our best effort at determining the specific meaning," majority op., ¶103 n.51 (emphasis added); rather, in my view, no effort——other than one to rewrite the statute——can overcome the plain and broad meaning of the terms used by the legislature here. See infra ¶¶148, 150-153.

"fabricating," because the ordinary meaning of "processing" is so broad.[16] But the fact that an abstract definition of "processing" could encompass the abstract definitions of the other statutory terms does not necessarily displace them, as their use might be more appropriate in certain contexts. For example, on the one hand, we think of films as being "produced" and some stories as being "fabricated," even though no one would dispute that making a film or making up a story is a process. On the other hand, we think of some foods——American cheese slices, for example——as being "processed."

¶150 In other words, surplusage is not to be assumed merely because the legislature has used a broad term. See Pawlowski v. Am. Family Mut. Ins. Co., 2009 WI 105, ¶22, 322 Wis. 2d 21, 777 N.W.2d 67 ("The use of different words joined by the disjunctive connector 'or' normally broadens the coverage of the statute to reach distinct, although potentially overlapping sets.") This is perhaps particularly true where, as here, the legislature has invited such overlapping interpretations by specifically defining two of the terms as synonyms. See Georgina G. v. Terry M., 184 Wis. 2d 492, 540, 516 N.W.2d 678 (1994) (Bablitch, J., dissenting) ("The legislature at times, as here, deliberately

---

[16] In this regard, I note that the court's conclusion that "processing" is "a task that can be completed without transforming the property into a new product, or adding anything to it that was not already there" does not avoid displacing "producing" and "fabricating." Majority op., ¶103. Just because "processing" encompasses tasks that are not "producing" or "fabricating" does not mean that "producing" and "fabricating" are not subordinate forms of "processing."

12

paints with a very broad . . . brush."); see also Scalia & Garner, supra ¶144 at 174 ("[I]t is no more the court's function to revise by subtraction than by addition.").

¶151 Regardless of the amount of overlap, under a plain meaning analysis Stuyvesant Dredging's work constituted "processing," as that term is used in Wis. Stat. § 77.52(2)(a)11. We begin with the language of the statute. Kalal, 271 Wis. 2d 633, ¶45. The statute states in relevant part as follows:

> (2) For the privilege of selling, performing or furnishing the services described under par. (a) at retail in this state to consumers or users, a tax is imposed upon all persons selling, performing or furnishing the services at the rate of 5% of the gross receipts from the sale, performance or furnishing of the services.
>
> (a) The tax imposed herein applies to the following types of services: . . .
>
> 11. The producing, fabricating, processing, printing or imprinting of tangible personal property for a consideration for consumers who furnish directly or indirectly the materials used in the producing, fabricating, processing, printing or imprinting. This subdivision does not apply to the printing or imprinting of tangible personal property that results in printed material, catalogs, or envelopes that are exempt under s. 77.54 (25) or (25m).

§ 77.52(2)(a)11.

¶152 "Processing" is not defined in the statute, thus, resort to dictionary definitions is not inappropriate. See Kalal, 271 Wis. 2d 633, ¶45 ("Statutory language is given its common, ordinary, and accepted meaning . . . ."). "Processing" is defined in dictionaries as follows: (1) "to subject to a special process or treatment"; "to subject to or handle through

13

and established usually routine set of procedures";[17] (2) "to put through the steps of a prescribed procedure"; "to prepare, treat, or convert by subjecting to a special process";[18] (3) "[t]o subject to or treat by a special process; to operate on mechanically or chemically."[19]

¶153 In my view, Stuyvesant Dredging's separation of dredged materials plainly falls under any of these definitions of "processing." "If the meaning of the statute is plain, we ordinarily stop the inquiry." Kalal, 271 Wis. 2d 633, ¶45. And I would reiterate that the fact that the definition of "processing" is broad does not mean that it is ambiguous, nor does it render the statute meaningless. See Kernz v. J. L. French Corp., 2003 WI App 140, ¶16, 266 Wis. 2d 124, 667 N.W.2d 751 ("[A] phrase is not ambiguous simply because it is general or broad."); see also Zarnstorff v. Neenah Creek Custom Trucking, 2010 WI App 147, ¶21, 330 Wis. 2d 174, 792 N.W.2d 594 (quoting Lawver v. Boling, 71 Wis. 2d 408, 422, 238 N.W.2d 514 (1976)) ("[A]n otherwise unambiguous provision is not rendered ambiguous simply because it is difficult to apply to the facts of a particular case.").

---

[17] Process merriam-webster.com, (search "processing") (verb) (last visited May 11, 2018).

[18] Process ahdictionary.com, (search "processing") (tr. v.) (last visited May 11, 2018).

[19] Majority op., ¶103 (quoting Processing The Oxford English Dictionary (2d ed. 1989) (definition 3.a.)).

14

¶154 In sum, the plain language of the statute compels the conclusion that, in the Venn diagram of definitions, "processing" is the paper on which overlapping circles for "producing" and "fabricating" are drawn. This, however, does not mean that Stuyvesant Dredging's work cannot be understood as falling within the plain meaning of "processing."

IV. CONCLUSION

¶155 I agree with the result the court reaches. I concur and write separately because the analysis that the lead opinion employs to reach its conclusions is concerning. First, in my view, it is both unnecessary and inadvisable to rely on constitutional grounds for ending our practice of deferring to administrative agencies' conclusions of law. Deference to administrative agencies was a court-created doctrine and, thus, is one that can be court eliminated. We need not reach for the constitution to so act.

¶156 Second, in interpreting the statute here, the court relies on ordinary meaning to define all of five terms, even though two of them have statutory definitions. Additionally, the court relies on the surplusage canon as grounds for selectively defining necessarily broad terms, even though the complete overlap between the two statutorily-defined terms indicates that the legislature may well have intended for overlap among the undefined terms as well.

¶157 Nevertheless, I agree that "'processing' encompasses Stuyvesant Dredging's separation of river sediment into its

15

component parts." Majority op., ¶104. Accordingly, I respectfully concur.

¶158 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins Part I of this concurrence.

¶159 MICHAEL J. GABLEMAN, J. *(concurring).* I agree that we should no longer give deference to administrative agency conclusions of law and that the services provided by Stuyvesant Dredging constitute "processing" under Wis. Stat. § 77.52(2). However, unlike the lead opinion, I would apply the doctrine of constitutional avoidance and eliminate deference by withdrawing the language in <u>Harnischfeger Corp. v. LIRC</u>, 196 Wis. 2d 650, 539 N.W.2d 98 (1995), that indicated deference is mandatory. Specifically, I would withdraw the following two sentences: (1) "courts should defer to an administrative agency's interpretation of a statute in certain situations," <u>id.</u> at 660; and (2) "[o]nce it is determined under <u>Lisney</u> that great weight deference is appropriate, we have repeatedly held that an agency's interpretation must then merely be reasonable for it to be sustained," <u>id.</u> at 661.[1] I would withdraw this language because the <u>Harnischfeger</u> court's use of the word "should" in the first sentence did not expose the mandatory nature of deference, which does not appear until the second sentence with its use of the word "must." In so doing, I would thereby avoid addressing the issue on constitutional grounds.[2]

---

[1] By implication, which I now make express, my analysis and conclusion apply just as strongly to due weight deference.

[2] Accordingly, I join the following parts of the majority opinion: ¶¶1-3, I, II (intro), II.A. (intro), II.A.1., II.A.2., II.A.6., II.B., III, and the mandate. To the extent the first sentence of ¶84 implies a holding on constitutional grounds, I do not join it.

1

¶160 Constitutional avoidance is a subset of the axiom that "[a]n appellate court should decide cases on the narrowest possible grounds." State v. Castillo, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997). "Consistent with this rule is the recognition that a court will not reach constitutional issues where the resolution of other issues disposes of an appeal." Id. In the present case, we need not determine whether our constitution prohibits deference because deference is nothing more than a judicial construct based on our misreading of Wis. Stat. § 227.57(10). See lead op., ¶¶27-32.

¶161 As the lead opinion aptly explains, the deference doctrine is a beast of our creation——neither the legislature nor executive purported to require that we apply deference. See lead op., ¶¶18-33. Therefore, we are free to dispense with deference as simply as we adopted it. See Holytz v. Milwaukee, 17 Wis. 2d 26, 37, 115 N.W.2d 618 (1962), superseded by statute, Wis. Stat. § 893.80.

¶162 We created deference through a continued misreading of Wis. Stat. § 227.57(10), which culminated in our holding in Harnischfeger, 196 Wis. 2d at 661, that deference is required, not merely an aid in statutory interpretation. See lead op., ¶¶27-33. We can (and therefore should) remedy this misreading without invoking the constitution. Johnson Controls, Inc. v. Emplrs. Ins., 2003 WI 108, ¶99, 264 Wis. 2d 60, 665 N.W.2d 257; see also lead op., ¶¶82-83.

¶163 The lead opinion briefly states the five traditional factors we use when deciding whether to overrule one of our

prior decisions, lead op., ¶82, and then just as briefly concludes that our prior decisions regarding deference must be overruled based solely on their unconstitutional holdings, id., ¶83. Our authority to withdraw language from our prior decisions alone is sufficient to the task and the lead opinion's invocation of the constitution in this context is an unnecessary and imprudent addition to its substantive analysis.

I. THE TRADITIONAL FIVE CIRCUMSTANCES FOR OVERTURNING PRECEDENT

¶164 We are "more likely to overturn a prior decision when one or more of the following circumstances is present":

> (1) Changes or developments in the law have undermined the rationale behind a decision;
>
> (2) There is a need to make a decision correspond to newly ascertained facts;
>
> (3) There is a showing that the precedent has become detrimental to coherence and consistency in the law;
>
> (4) The prior decision is "unsound in principle;" or
>
> (5) The prior decision is "unworkable in practice."

Bartholomew v. Wis. Patients Comp. Fund, 2006 WI 91, ¶33, 293 Wis. 2d 38, 717 N.W.2d 216 (quoting Johnson Controls, 264 Wis. 2d 60, ¶¶98-99). I discuss these five "circumstances" in order of how strongly they apply to deference.

A. The Prior Decision is "Unsound in Principle"

¶165 The fourth circumstance is especially present with regard to deference and strongly supports our decision to eliminate it. Deference is simply unsound in principle. In theory, deference should make courts' decision-making easier and more efficient. See The Honorable Patience Drake Roggensack,

Elected to Decide: Is the Decision-Avoidance Doctrine of Great Weight Deference Appropriate in This Court of Last Resort?, 89 Marq. L. Rev. 541, 544 (2006). In practice, however, deference does not save significant court resources. Because the level of deference afforded is often outcome-determinative, id. at 559, parties and courts often expend just as much effort arguing and deciding the proper level of deference as they would the merits, see, e.g., Emmpak Foods, Inc. v. LIRC, 2007 WI App 164, ¶¶3-8, 303 Wis. 2d 771, 737 N.W.2d 60. Thus, deference often hinders rather than helps meaningful judicial review while providing no corresponding benefit. See generally Brown v. LIRC, 2003 WI 142, ¶¶10-19, 267 Wis. 2d 31, 671 N.W.2d 279 ("Our analysis in this case centers around the standard of review.").

¶166 Importantly, deference (especially great weight deference), if correctly and honestly applied, leads to the perverse outcome of courts often affirming inferior interpretations of statutes. See, e.g., id., ¶44 ("Were this court reviewing the order of LIRC de novo, the result might very well be different."). In our role as court of last resort, we should ensure that erroneous-but-reasonable legal conclusions are corrected. See Hilton v. DNR, 2006 WI 84, ¶54, 293 Wis. 2d 1, 717 N.W.2d 166 (Prosser, J., concurring). Any doctrine that allows erroneous legal conclusions to survive unscathed is unsound in principle.

B. The Need to Make a Decision Correspond to Newly Ascertained Facts

¶167 The second circumstance also applies in this case, though to a lesser extent. Deference is based on the theory

that administrative agencies develop expertise in their realm. Barron Elec. Coop. v. PSC, 212 Wis. 2d 752, 759, 569 N.W.2d 726 (Ct. App. 1997) ("[A]n . . . important principle of administrative law is that, in recognition of the expertise and experience possessed by agencies, courts will defer to their interpretation of statutes in certain situations."); see also DOR v. Menasha Corp., 2008 WI 8, ¶¶48-50, 311 Wis. 2d 579, 754 N.W.2d 95. However, we do not scrutinize whether agency decision-makers actually possess any expertise. For example, some agency decisions are made by a single hearing examiner——of unknown expertise or experience. Roggensack, supra ¶7, at 557. Further, under the erstwhile deference construct, it is possible for multi-member agency review boards to lack substantial experience or expertise. Id. at 558 (questioning whether LIRC commissioners who served, on average, 3.7 years each between 1979 and 2004 possessed more expertise in interpreting statutes than courts). We may say that it is only a matter of speculation that agency decision-makers possess less expertise than courts when it comes to interpreting various statutes. Importantly, it is equally a matter of speculation that they possess more. Such is not the kind of foundation upon which sound judicial doctrines are built.

### C. The Other Circumstances

¶168 The first, third, and fifth circumstances do not substantially apply in this case. Though, for purposes of the first circumstance, we may be able to infer that the legislature disapproves of deference based on its enactment of Wis. Stat.

5

§ 227.57(11), such an inference is too weak to support overruling decades of prior decisions. As to the third circumstance, deference is intended to maintain consistency in the law, though it is a matter of reasonable debate as to whether it achieves that goal. Hilton, 293 Wis. 2d 1, ¶¶64-65 (Prosser, J., concurring). Finally, despite its many flaws, deference is certainly workable in practice for purposes of the fifth circumstance.

## II. CONCLUSION

¶169 Clearly, "one or more of the [listed] circumstances is present" such that we can and should end our practice of deferring to administrative agency conclusions of law without invoking the constitution. Bartholomew, 293 Wis. 2d 38, ¶33. I would, therefore, follow the law and apply the doctrine of constitutional avoidance in order to decide this case on the narrowest possible grounds. For the foregoing reasons, I respectfully concur.

¶170 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins this concurrence.

6